The **PRESBYTERY OF NEW JERSEY OF THE ORTHODOX PRESBYTERIAN CHURCH, Calvary Orthodox Presbyterian Church of Wildwood, and Rev. David B. Cummings, Plaintiffs,**

v.

James **FLORIO, Robert Del Tufo, Marilyn Flanzbaum, Roman Angel, Betty Carson, Olga L. Vasquez–Clough, Felton Lingo, Sr., Reinhold W. Smyczek, Casey Tam, C. Gregory Stewart, John Doe(s), and Jane Doe(s), Defendants.**

Civ. No. 92–1641 (WGB).

United States District Court, D. New Jersey.

Sept. 13, 1995.

**498**

Thomas S. Neuberger, Wilmington, DE, Richard J. Traynor, Morristown, NJ, for Plaintiffs.

Robert J. Del Tufo, Attorney General of New Jersey by William H. Lorentz, Charles

S. Cohen, Andrea M. Silkowitz, Newark, NJ, for State Defendants.

Evans, Osborne & Kreizman by Lewis H. Robertson, Little Silver, NJ, for Amicus Curiae, the American Civil Liberties Union of New Jersey.

Montgomery, McCracken, Walker & Rhoads by Louis A. Petroni, Cherry Hill, NJ, for Religious Amicus Curiae [1].

## OPINION

BASSLER, District Judge:

Plaintiff, Reverend David B. Cummings ("Reverend Cummings") moves for summary judgment declaring several provisions of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. §§ 10:5–1—10:5–42, which added the category of "affectational or sexual orientation" to the list of traits or characteristics protected against discrimination in, among other things, employment, business transactions, housing, and public accommodations. *See* N.J.S.A. § 10:5–12. Plaintiff claims that the NJLAD's prohibition against discrimination based upon "affectational or sexual orientation," both as written and as applied to him, violates the First Amendment to the United States Constitution.

In this action under 42 U.S.C. section 1983, Plaintiff asserts claims against several state officials responsible for enforcing the NJLAD, including Defendants, James Florio, Robert Del Tufo, Marilyn Flanzbaum, Roman Angel, Betty Carson, Olga L. Vasquez–Clough, Felton Lingo, Sr., Reinhold W. Smyczek, Casey Tam, and C. Gregory Stewart (collectively referred to as the "State Defendants").[2]

---

1. James E. Andrews as Stated Clerk of the Presbyterian Church (U.S.A.) General Assembly; the Diocesan Council of the Episcopal Diocese of Newark, Right Rev. John S. Spong, Bishop of the Episcopal Diocese of Newark; the Lutheran Office of Governmental Ministry in New Jersey; the New Jersey–West Hudson Valley Council of the Union of American Hebrew Congregations; the New Jersey Synod Council of the New Jersey Synod, Evangelical Lutheran Churches in America; the New Jersey Council of Churches; and the United Church of Christ Office for Church in Society.

2. In this action under 42 U.S.C. § 1983, Plaintiff seeks relief from the State Defendants in their official capacities. When this action was filed in 1992, Defendants held the following offices in New Jersey's government: James Florio, Governor; Robert Del Tufo, Attorney General and board member, New Jersey Division on Civil Rights; Marilyn Flanzbaum, Roman Angel, Betty Carson, Olga L. Vasquez–Clough, Felton Lingo, Sr., Reinhold W. Smyczek, and Casey Tam, also board members of the New Jersey Division of Civil Rights; and C. Gregory Stewart, Director of the Division on Civil Rights. Although James Florio has since been replaced as governor by Christine Todd Whitman, and Robert Del Tufo by

The Defendants move to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Alternatively, the Defendants request this Court either to: (1) abstain from deciding the merits of this action based upon *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); or (2) issue a declaratory judgment adopting as definitive the interpretation of the NJLAD contained in the two affidavits of C. Gregory Stewart, Director, Division on Civil Rights.

If this case is ripe and Plaintiff possesses standing to maintain this action, this Court has jurisdiction under 28 U.S.C. sections 1331 and 1343. For the reasons set forth in this Opinion, Reverend Cummings' motion for summary judgment is **denied**. Additionally, Defendants' motion for a declaratory judgment is **denied**. Defendants' motion to dismiss is **granted in part and denied in part**. This Court **dismisses** all of Reverend Cummings' claims, except for his claim that N.J.S.A. sections 10:5–12e and n are unconstitutional as applied to him. This Court shall **abstain** from deciding the merits of Reverend Cummings' as applied challenge pending an adjudication in New Jersey state court.

## I. *BACKGROUND*

### A. *Plaintiffs' Challenge to the NJLAD*

In 1992, the New Jersey Legislature added "affectational and sexual orientation" to the list of personal characteristics protected against discrimination, which previously included race, creed, color, national origin, ancestry, age, sex, and marital status. N.J.S.A. § 10:5–12(a). As defined by the NJLAD, the category "affectational and sexual orientation" includes "male or female heterosexuality, homosexuality, or bisexuality by inclination, practice, identity or expression, having a history thereof or being perceived, presumed or identified by others as having such orientation." N.J.S.A. § 10:5–5(hh).

Shortly thereafter, Plaintiffs, the Presbytery of New Jersey of the Orthodox Presbyterian Church ("OPC"), Calvary Orthodox Presbyterian Church of Wildwood ("Calvary"), and Reverend Cummings initiated this declaratory judgment action challenging the newly enacted prohibition against discrimination based upon "affectational and sexual orientation" on the ground that it violates the First, Fifth, Fourteenth, and Ninth Amendments to the United States Constitution.

Specifically, Plaintiffs sought to have seven provisions of the NJLAD declared unconstitutional. Two of the challenged provisions apply to employers: one makes it unlawful "to refuse to hire or employ or to bar or to discharge or require to retire" any individual based upon a characteristic protected by the NJLAD, N.J.S.A. § 10:5–12(a); the other bans printing or distributing statements that express, either directly or indirectly, that employment opportunities are restricted or limited for persons possessing protected characteristics, N.J.S.A. § 10:5–12(c). With respect to hiring decisions, however, the NJLAD expressly permits a religious organization to follow "the tenets of its religion in establishing and utilizing criteria for employment of an employee." N.J.S.A. § 10:5–12(a). Another provision of the NJLAD proscribes restricting access to public accommodations on the basis of protected traits. N.J.S.A. § 10:5–12(f). The NJLAD authorizes the Director of the New Jersey Division on Civil Rights to promulgate regulations requiring both employers and providers of public accommodations to post public notices informing employees and patrons of their rights under the NJLAD. N.J.S.A. § 10:5–12(j).

Furthermore, two provisions prohibit refusing to do business with an individual because of a protected characteristic. N.J.S.A. § 10:5–12(*l*), (m). To that end, the NJLAD makes it unlawful for anyone "to aid, abet, incite, compel, coerce, or induce" any prohibited discrimination in business transactions, including boycotting any person who refuses to engage in such unlawful activity. N.J.S.A.

Deborah T. Poritz as Attorney General, Plaintiffs have not substituted the parties named as Defendants. When an officer sued in his or her official capacity ceases to hold office, "the officer's successor is automatically substituted as a party." Fed.R.Civ.P. 25(d)(1).

§ 10:5–12(n). Finally, the NJLAD proscribes aiding, abetting and inciting any other conduct forbidden under the Act. N.J.S.A. § 10:5–12(e).

Moreover, the NJLAD provides several enforcement mechanisms, both public and private. By filing a complaint with the New Jersey Division on Civil Rights, an aggrieved person can initiate an investigation of the allegedly illegal practice that may prompt the State to commence an enforcement action. N.J.S.A. § 10:5–13—10:5–14.1. Alternatively, an aggrieved individual may proceed directly to state court. N.J.S.A. § 10:5–13. The NJLAD expressly confers standing upon "any individual who has been discriminated against" as well as "any organization which represents or acts to further the interests of those who have been discriminated against." N.J.S.A. § 10:5–38.

According to Plaintiffs, *The Holy Bible* and the OPC's doctrine require Plaintiffs and more than two thousand individual members of the OPC in New Jersey to condemn homosexuality, bisexuality, and heterosexual sex outside of marriage as "grievous sins." Amended Compl. ¶¶ 6, 22. Plaintiffs alleged that their religious beliefs require them to "draw reasonable distinctions" based upon permissible and impermissible sexual conduct. Amended Compl. ¶ 22.

As a result, Plaintiffs allege that they have directly and indirectly discriminated against persons based upon "sexual or affectational orientation," even after the 1992 amendments to the NJLAD made this conduct unlawful. Plaintiffs have allegedly committed several types of unlawful discriminatory conduct, including: speaking out, printing and disseminating publications that condemn homosexuality, bisexuality, and heterosexual sex outside of marriage as "an abomination and sinful;" inquiring about the sexual practices of their employees and refusing to employ anyone engaged in "sinful" sexual conduct; aiding and abetting discrimination against persons on the basis of their sexual conduct; and refusing to transact business with homosexuals, bisexuals, and heterosexuals having sex outside of marriage. Amended Compl. ¶¶ 49, 51, 57, 69.

Furthermore, Plaintiffs assert that OPC doctrine requires ministers and elders to discipline church members who are engaged in "sexual sin" or teach that "adultery or homosexuality [ar]e an acceptable lifestyle and that we [the OPC] should not 'discriminate' in our dealings with such people." Stevenson Aff. ¶ 6; *accord* Cummings Aff. ¶ 5. If an OPC member refused to abandon a "sexually sinful" lifestyle or to recant "heretical" statements, OPC ministers or elders would be obligated to file "formal disciplinary charges" against that member. Stevenson Aff. ¶ 7; *accord* Bahnsen Aff. ¶ 4. Disciplinary action could result in expulsion of the unrepentant church member from OPC facilities, functions, and sacraments, including "the Lord's Supper," baptism, and marriage. Amended Compl. ¶¶ 27, 29, 33, 34, 35.

### B. Procedural History

Shortly after initiating this action, Plaintiffs requested this Court to issue a preliminary injunction precluding Defendants from enforcing the 1992 amendments to the NJLAD prohibiting discrimination based upon "affectational and sexual orientation" pending a determination of their constitutionality.

In opposition to Plaintiffs' application, Defendants relied upon the affidavit of C. Gregory Stewart, Director, New Jersey Division on Civil Rights (the "Division"), the agency charged with enforcing and applying the NJLAD. N.J.S.A. §§ 10:5–6, 10:5–9.1. As Director of the Division, Stewart is responsible for interpreting and construing the NJLAD with advice from the Attorney General. N.J.S.A. §§ 10:5–8d, 10:5–8g.

In the affidavit, Director Stewart set forth the Division's interpretation of relevant provisions of the NJLAD. In accordance with the Division's "longstanding construction" of the NJLAD, Director Stewart represented that "places of religious worship" are not public accommodations subject to the proscriptions of the NJLAD. Stewart Aff. ¶ 10. Additionally, the NJLAD expressly permits a religious organization to make employment decisions based upon the "tenets" of the religion. N.J.S.A. § 10:5–12(a). Director Stewart indicated that the Division had no inten-

tion of construing the NJLAD to "tend or threaten to violate the sincere 'tenets' of any religion ... [or] to engage in any determination or judgment as to what is or is not a 'tenet' of religious faith." Stewart Aff. ¶ 12. Finally, Director Stewart stated that because of First Amendment concerns, the Division "has not in the past prosecuted and has no intention to prosecute essentially exempt churches for sincerely held religious belief or practice, or speech consistent with such belief, or for a refusal to engage in certain speech or for following their religious tenets." Stewart Aff. ¶ 13.

This Court denied Plaintiffs' application for preliminary relief in an oral opinion rendered on June 19, 1992. Plaintiffs appealed this denial to the Third Circuit Court of Appeals, which affirmed this Court's decision in an unpublished memorandum opinion. *Presbytery of New Jersey v. Florio,* 983 F.2d 1052 (1992) (*Presbytery I* ), *see* 983 F.2d 1052 (3d Cir.1992) (Table).

After the Third Circuit's decision, this Court entertained Defendants' motion to dismiss the Amended Complaint on the grounds that Plaintiffs' lacked standing, their claims were not yet ripe for adjudication, and that *Pullman* abstention was appropriate. *See* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971. In light of Director Stewart's affidavit, which clarified the Division's interpretation of the NJLAD, Plaintiffs conceded that the scope of their challenge to the 1992 amendments to the NJLAD had been limited to the following provisions: (1) N.J.S.A. § 10:5–12(e) (making it unlawful to aid and abet any violations of the Act); (2) N.J.S.A. § 10:5–12(n) (prohibiting aiding and abetting refusals to do business, including boycotts); and (3) N.J.S.A. § 10:5–12(j) (requiring posting of notices). *Presbytery II,* 830 F.Supp. at 247; 40 F.3d at 1461. Plaintiffs argued that the first two sections impermissibly restrict freedom of speech, while the third provision, by compelling forced speech, violates their freedom of conscience. *Presbytery II,* 830 F.Supp. at 247.

In granting the motion to dismiss, this Court concluded that Plaintiffs' claims were not ripe. *Presbytery of New Jersey v. Florio,* 830 F.Supp. 241, 250 (D.N.J.1993), *rev'd in part,* 40 F.3d 1454 (3d Cir.1994) [hereinafter *Presbytery II* ]. Based upon the Stewart Affidavit, this Court concluded that the State had waived enforcement of the NJLAD against both the institutional Plaintiffs and Reverend Cummings for any discrimination by them on the basis of "affectational or sexual orientation." *Presbytery II,* 830 F.Supp. at 249. Consequently, this Court determined that Plaintiffs did not face "a 'real and immediate' threat of enforcement" by the State as required to maintain a ripe declaratory judgment action. *Id.* (citing *Salvation Army v. New Jersey Dept. of Community Affairs,* 919 F.2d 183, 192 (3d Cir.1990)).

Similarly, this Court concluded that Plaintiffs had not substantiated their general allegation that the threat of private enforcement had chilled their religious expression with "evidence of a present and concrete effect" upon their discriminatory speech and conduct. *Id.* (citing *Salvation Army,* 919 F.2d at 193). Therefore, Plaintiffs claims against the as yet unknown Defendants who might utilize the private enforcement provisions of the NJLAD were similarly unripe for adjudication. *Id.*

Since this Court dismissed Plaintiffs' Complaint as unripe, it did not reach the issues of standing and abstention.

In response to this Court's decision, Plaintiffs again appealed to the Third Circuit, which affirmed this Court's dismissal of the claims by the institutional Plaintiffs, the OPC and Calvary, but reversed with respect to Plaintiff Cummings. *Presbytery II,* 40 F.3d at 1470. The Third Circuit held that although the Amended Complaint consistently refers to Plaintiff Cummings as "Reverend," its allegations encompass allegedly illegal actions by Cummings in his institutional capacity as well as his personal life. *Presbytery II,* 40 F.3d at 1465–66. The Stewart affidavit, which continually refers to "religious organizations" and "exempt churches," waived prosecution of Reverend Cummings for actions taken in his official capacity as a minister. The affidavit did not, however, "disavow enforcement against the members of the church for their public activities nor does it preclude enforcement against Cummings for his activities outside the Church." *Id.* at

1461. Consequently, the Third Circuit held that Reverend Cummings had presented a controversy ripe for adjudication. *Id.* at 1470.

## II. *DISCUSSION*

On remand to this Court, Reverend Cummings, the only remaining Plaintiff moves for summary judgment on the merits of his First Amendment challenge. Meanwhile, the Defendants have renewed their motion to dismiss on the grounds that Cummings' claims are not ripe for adjudication, he lacks standing and *Pullman* abstention is appropriate.

### A. *Issues Before the Court for Resolution*

■ As a threshold matter, this Court must identify which issues are properly before this Court for resolution. Defendants' have moved for a declaration, "adopting as definitive" the interpretations of the challenged provisions of the NJLAD contained in Director Stewart's affidavits. Def.Br. at 4. The Declaratory Judgment Act provides that federal courts "upon the filing of an appropriate pleading, may declare the rights and other legal relation of any interested party . . ." In fact, Defendants have not filed any pleadings in this action, having chosen to file two motions to dismiss in lieu of filing an answer. As a result, Defendants have not asserted any cross-claim or any other claim to affirmative relief. Since Defendants' have failed to file any pleading upon which a declaratory judgment could be based, their motion for a declaratory judgment is **denied.**

Furthermore, this Court must identify which provisions of the NJLAD remain before the Court for a determination of their constitutionality. Both before this Court and the Third Circuit, Plaintiff conceded that Director Stewart's initial affidavit narrowed the scope this challenge to three provisions of the NJLAD: (1) N.J.S.A. § 10:5–12e (prohibiting aiding and abetting violations of the Act); (2) N.J.S.A. § 10:5–12n (making it unlawful to aid and abet discriminatory refusals to do business, including through boycotting); and (3) N.J.S.A. § 10:5–12j (requiring posting of notices). *Presbytery II,* 830 F.Supp. at 247; 40 F.3d at 1461. In spite of this prior concession, Plaintiff's Notice of Motion

for Summary Judgment requests this Court to declare four additional provisions of the NJLAD unconstitutional: N.J.S.A. § 10:5–12(c) (prohibiting employers from distributing statements that restrict employment opportunities available to protected persons); N.J.S.A. § 10:5–12f (banning discriminatory limitations on access to public accommodations); and N.J.S.A. §§ 10:5–12*l* and m (making it unlawful to refuse to engage in business transactions or to extend credit based upon sexual orientation).

In an effort to convince this Court to rule upon the constitutionality of all seven provisions, Plaintiff contends that Director Stewart's supplemental affidavit "dramatically reverses the State's prior *enforcement* representations made to this Court and to the Third Circuit" Pl.Letter Br. of 6/20/95, at 1. Plaintiff suggests that these alleged changes in the State's enforcement policy have somehow reactivated his previously abandoned challenge to sections 10:5–12c and f. Plaintiff offers no explanation for his renewed challenge to the provisions of the NJLAD that prohibit "direct" discrimination in business transactions, N.J.S.A. §§ 10:5–12*l* and m.

In fact, Director Stewart's supplemental affidavit adds little, if anything, to the plain language of N.J.S.A. sections 10:5–12c and f. In the supplemental affidavit, Director Stewart argues that the Amended Complaint fails to allege that either Reverend Cummings or any members of the OPC are covered employers or public accommodations subject to the requirements of the NJLAD. Stewart Supp.Aff. ¶¶ 19–20. In making this argument, Director Stewart does not enunciate any new State enforcement policy; he merely provides an interpretation of the existing statutory language. Whether this Court adopts Director Stewart's interpretation depends upon whether it comports with definitions of "employer" and "public accommodation" provided by the NJLAD itself. *See* N.J.S.A. § 10:5–5e, *l.*

Therefore, it is the law of this case that Plaintiff has narrowed the scope of his original challenge to the NJLAD to the following provisions: N.J.S.A. §§ 10:5–12e, n and j. Since Plaintiff has previously abandoned his

direct challenge to N.J.S.A. section 10:5–12c, f, *l* and m, the State Defendants' motion to dismiss these claims is **granted.** These four provisions, however, remain indirectly before the Court to the extent that they are incorporated by reference into the challenged aid and abet provisions, N.J.S.A. sections 10:5–12e and n.

### B. Justiciability

Federal courts possess the power to resolve only actual "cases" or "controversies." U.S. CONST., art. III, § 2. Both outgrowths of the "case" or "controversy" requirement, the justiciability doctrines of standing and ripeness relate not only to a federal court's power to adjudicate a particular controversy, but also to the wisdom of its doing so. *Presbytery II,* 40 F.3d at 1462. The Defendants contend that the Amended Complaint fails to meet both of these constitutional prerequisites for judicial action.

■ Standing relates to "who is a proper party to litigate a particular matter, ripeness [doctrine] ... determine[s] when that litigation may occur. Specifically ... [it] seeks to separate matters that are premature for review because the injury is speculative and may never occur, from those cases that are appropriate for federal court action." Erwin Chemerinsky, *Federal Jurisdiction,* § 2.4 (1989).

### 1. Ripeness

In response to the Third Circuit's ruling, the Defendants have submitted a supplemental affidavit from Director Stewart, further elaborating upon the Division's interpretation of the NJLAD. In so doing, the Defendants argue that they have eliminated any "real and immediate" threat of [state] enforcement" against Reverend Cummings and other religiously motivated persons under the aid and abet and boycott provisions of the NJLAD. *See Salvation Army,* 919 F.2d at 192. As a result, this Court must once again assess whether Reverend Cummings' claims are ripe for adjudication.

■ A ripe case involves "a real and substantial controversy admitting of specific relief through a decree of conclusive charac-

ter, as distinguished from an opinion advising what the law would be on a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). The purpose of ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

■ As enunciated by the Supreme Court, the decision whether a claim is ripe is governed by two considerations: "the fitness of issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515. "[T]he prototypical case not yet ripe for adjudication involves a plaintiff who seeks pre-enforcement review of a statute." *Kessler Institute for Rehabilitation v. Borough of Essex Fells,* 876 F.Supp. 641, 657 (D.N.J.1995) (citing Chemerinsky, § 2.4). Since pre-enforcement review is often pursued through a declaratory judgment action, ripeness is a special problem in this area. *See Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

■ As a result, the Third Circuit has adopted a three part test for determining whether pre-enforcement review is appropriate in the context of a declaratory judgment action. A court must examine: "[1] the adversity of the interests of the parties, [2] the conclusiveness of the judicial judgment, and [3] the practical help, or utility of that judgment." *Step–Saver Data Sys., Inc. v. Wyse Tech.,* 912 F.2d 643, 647 (3d Cir.1990), *see also Armstrong World Indus., Inc. v. Adams,* 961 F.2d 405, 412–24 (3d Cir.1992) [hereinafter *Armstrong* ] (noting that these factors are not exclusive).

■ In order to establish the first factor, an adversity of interest, a party "need not have suffered a 'completed harm.'" *Presbytery II,* 40 F.3d at 1463 (citing *Armstrong,* 961 F.2d at 412). Adversity of interest exists where a plaintiff faces "a substantial threat of real harm ... that ... remain[s] 'real and immediate' throughout the course of the liti-

gation." *Id.* (citing *Salvation Army,* 919 F.2d at 192). If "intervening events remove the possibility of harm," a court should not address the now speculative controversy. *Id.* (citations omitted).

▪ The second factor, conclusiveness, derives from the requirement that a ripe controversy must be remediable "through a decree of conclusive character, as distinguished from an opinion advising what the law would be on a hypothetical state of facts." *Aetna Life Ins. Co.,* 300 U.S. at 240, 57 S.Ct. at 464. "A declaratory judgment granted in the absence of a concrete set of facts would itself be a 'contingency' and applying it to actual controversies which subsequently arise would be an 'exercise in futility.'" *Presbytery II,* 40 F.3d at 1463 (citing *Armstrong,* 961 F.2d at 412). The need for a "concrete set of facts" varies. *Armstrong,* 961 F.2d at 421. The Supreme Court has held that the "actual factual setting" is important in cases alleging unconstitutional takings, see *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 294–95, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981), while "a factual record is not as important where the question is 'predominantly legal.'" *Armstrong,* 961 F.2d at 421 (quoting *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983)).

▪ Regarding the third factor, utility, this requirement is met where "the court is convinced that [by its action] a useful purpose will be served." *Step–Saver,* 912 F.2d at 649 (citations omitted). The court should assess the utility of a judgment in terms of "whether the parties' plans of actions are likely to be affected by a declaratory judgment." *Id.* at 649 n. 9.

▪ Finally, these three factors are not the only relevant considerations in determining whether judicial intervention is appropriate. As an additional factor, the Supreme Court has considered whether "[p]ostponing consideration of the question presented, until a more concrete controversy arises, also has the advantage of permitting the state courts further opportunity to construe [the challenged provisions] ... and perhaps in the

process to 'materially alter the question to be decided.'" *Renne v. Geary,* 501 U.S. 312, 323, 111 S.Ct. 2331, 2339, 115 L.Ed.2d 288 (1991) (citations omitted).

### a. Adversity of Interest

▪ In deciding this motion to dismiss, this Court must accept all factual allegations contained in the Amended Complaint as true and draw all reasonable inferences therefrom in favor of the Plaintiff. *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990). "The test in reviewing a motion to dismiss for failure to state a claim is whether, under any reasonable reading of the pleadings, plaintiff may be entitled to relief." *Presbytery II,* 40 F.3d at 1465 (quoting *Colburn v. Upper Darby Township,* 838 F.2d 663, 665–66 (3d Cir.1988), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989)).

In holding that Cummings had presented a ripe controversy, the Third Circuit specifically expressed concern that the initial Stewart Affidavit did not obviate the threat that Reverend Cummings would be prosecuted if he, in his individual capacity, engaged in the acts alleged in paragraphs 49, 51, 57, and 69 of the Amended Complaint. *Presbytery II,* 40 F.3d at 1469. These acts include: speaking out and lobbying against homosexuality and other "sexual sins," Amended Compl. ¶¶ 49, 51; printing and disseminating materials that condemn these sexual practices, Amended Compl. ¶ 49; inquiring about the sexual practices of prospective employees; refusing to hire anyone committing "sexual sins," Amended Compl. ¶ 69; making reasonable distinctions based upon these sexual practices, Amended Compl. ¶ 51, 69; aiding and abetting discrimination against homosexuals, bisexuals and heterosexuals having sex outside of marriage, Amended Compl. ¶ 51; and refusing to "buy from, contract with, or otherwise do business with persons based upon that person's homosexual, bisexual, or heterosexual practices," Amended Compl. ¶ 57.

In deciding the pending motions, the Court must determine whether Director Stewart's supplemental affidavit has eliminated this "real and immediate" threat of Reverend Cummings being prosecuted for these dis-

criminatory activities alleged in the Amended Complaint. *See Salvation Army*, 919 F.2d at 192. If Director Stewart's supplemental affidavit insulates Reverend Cummings' allegedly discriminatory activities from prosecution, then this intervening interpretation of the NJLAD, offered by the State, has "remove[d] the possibility of harm" and this Court should not address the merits of this now speculative controversy. *Presbytery II*, 40 F.3d at 1463 (*citing Armstrong*, 961 F.2d at 412).

As a statement of general policy, Director Stewart maintains that the NJLAD does not apply to First Amendment protected speech that is unaccompanied by conduct in violation of the Act. Stewart Supp.Aff. ¶ 6. In other words, no one will be subject to prosecution under the NJLAD for "pure speech" that falls within the scope of the First Amendment's protections, regardless of its content and "wherever it may take place, in the 'pulpit' or outside of it." Stewart Supp.Aff. ¶¶ 8, 7, 6. Similarly, Director Stewart reaffirms that NJLAD does not authorize prosecution of anyone for either engaging or refusing to engage in speech based upon religious principle and belief. Stewart Supp.Aff. ¶ 7 (quoting Stewart Aff. ¶ 13). Rather, Director Stewart construes the NJLAD as prohibiting only: (1) "pure" speech that falls outside of the First Amendment's protection for a reason other than its discriminatory content; and (2) speech that is accompanied by conduct violative of the NJLAD. Stewart Supp.Aff. ¶¶ 6, 14.

Applying these general principles, Director Stewart construes N.J.S.A. section 10:5–12e, which makes it unlawful to "aid, abet, incite, compel or coerce" acts prohibited by the NJLAD, "or to attempt to do so," to require either speech that is not constitutionally protected or actions unlawful under the NJLAD.

To date, no reported or unreported decision has interpreted the prohibition against inciting violations of the NJLAD. N.J.S.A. § 10:5–12e; Stewart Supp.Aff. ¶ 14. If this incitement provision is ever enforced, Director Stewart assures that it "must be and will be read consistently with current First Amendment law" applying only to speech that is not protected by the First Amend-

ment because it is " 'directed to inciting or producing imminent lawless action and is likely to produce such action.' " Stewart Supp.Aff. ¶ 14 (citing *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (per curiam)). Under this interpretation, illegal incitement to discriminate under the NJLAD would not include "expressions of ... opposition to the mere existence of the law or to the people who happen to be included within any of the protected categories of the law, and advocacy that it be repealed or violated." Stewart Supp.Aff. ¶ 14.

Moreover, Director Stewart maintains that section 10:5–12e requires more than just speech to constitute illegal "aiding and abetting." Instead, section 10:5–12e "requires action which assists, supports, and supplements the action of another in conduct" that violates the NJLAD. Stewart Supp.Aff. ¶ 12.

Even under Director Stewart's interpretation of N.J.S.A. section 10:5–12e, Reverend Cummings and other OPC members face a real and immediate threat of prosecution if they engage in the activities alleged in the Amended Complaint. Plaintiff disavows any intention to engage in advocacy directed to and likely to result in "imminent lawless action," Pl.Br. at 32, which would be subject to prosecution under Director Stewart's interpretation of N.J.S.A. § 10:5–12e. Stewart Supp.Aff. ¶ 14 (citing *Brandenburg*, 395 U.S. at 447, 89 S.Ct. at 1829). Therefore, Plaintiff does not face any real threat of prosecution for incitement. Plaintiff's Amended Complaint specifically alleges, however, that Reverend Cummings and other OPC members intend to aid and abet discrimination against homosexuals, bisexuals, and heterosexuals engaged in sex outside of marriage, which is prohibited by the NJLAD. Amended Compl. ¶¶ 51,

Rather than accept Plaintiff's allegation that he and other OPC members intend to "aid and abet" discrimination on its face, the Defendants urge the Court to examine the specific types of allegedly prohibited conduct cited in the Amended Complaint. Director Stewart claims that the Amended Complaint merely alleges that Reverend Cummings and

others intend to encourage discrimination against persons engaged in "sexual sin" through "pure" First Amendment protected speech. Stewart Supp.Aff. ¶¶ 11, 12. Speech alone, unaccompanied by action that "assists, supports and supplements" another's actions in violation of the NJLAD, does not constitute unlawful aiding and abetting under section 10:5–12e as construed by the Division. Stewart Supp.Aff. ¶ 12.

Contrary to Director Stewart's characterization, Plaintiff has alleged conduct that satisfies Director Stewart's interpretation of aiding and abetting and thus could result in prosecution. Plaintiff alleges that he and other members of the OPC are employers subject to the NJLAD. Amended Compl. ¶ 67; *see also* ¶ 51. In addition, Plaintiff alleges that he and other OPC members "publish, circulate, issue, display, post and mail printed material condemning homosexuality, bisexuality, and heterosexual sex outside of marriage." ¶¶ 53, 51. Consistent with these allegations, Reverend Cummings could print a leaflet encouraging discrimination based upon "affectational or sexual orientation" and give it to an OPC member who is an employer. If that employer distributed it to prospective employees, that employer would have violated N.J.S.A. § 10:5–12c, which prohibits circulating statements that directly or indirectly indicate that employment opportunities will be discriminatorily limited based upon an applicant's sexual orientation. By printing and providing the leaflet to the employer, Reverend Cummings would have "assist[ed], support[ed] and supplement[ed]" the employer's conduct of distributing the leaflet in violation of the NJLAD. *See* N.J.S.A. § 10:5–12c. Therefore, such conduct by Reverend Cummings would constitute unlawfully aiding and abetting another in conduct violative of the NJLAD as those terms have been construed by Director Stewart. Since Director Stewart's supplemental affidavit has failed to eliminate Reverend Cummings' "real and immediate" threat of prosecution under section 10:5–12e, the parties interests remain adverse in this respect. *See Salvation Army,* 919 F.2d at 192.

In addition, Director Stewart's supplemental affidavit amplifies the Division's interpretation of the NJLAD provision that makes it unlawful to "aid, abet, incite, compel, coerce or induce" violations of the NJLAD provisions prohibiting discrimination in business or credit transactions, or "to attempt, or conspire to do so." N.J.S.A. § 10:5–12n (incorporating by reference N.J.S.A. §§ 10:5–12*l*, m. Conduct prohibited under this section includes boycotting. N.J.S.A. § 10:5–12n(2). Director Stewart represents that this provision will be interpreted to prohibit "*only*" such boycotts as are designed to achieve an unlawful objective, since such boycotts are not protected by the First Amendment." Stewart Supp.Aff. ¶ 16 (citing *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 915–920, 102 S.Ct. 3409, 3427–3429, 73 L.Ed.2d 1215 (1982). In the absence of an unlawful objective, Director Stewart claims that the NJLAD permits people, subject to minor restrictions, "to picket, advocate, speak and distribute leaflets and other written material around and about businesses" of their choosing. Stewart Supp.Aff. ¶ 16.

With the supplemental affidavit, Director Stewart has completely failed to eliminate the "real and immediate" threat of prosecution under section 10:5–12n(2) that Reverend Cummings and other OPC members face. *See Salvation Army,* 919 F.2d at 192. Plaintiff alleges that OPC members like himself "refuse[ ] to knowingly buy from, contract with, or otherwise do business with persons on the basis of that person's homosexual, bisexual, or heterosexual practices." Amended Compl. ¶ 57. Plaintiff and the other OPC members evidence their disapproval of homosexual, bisexual and heterosexual persons engaged in sex outside of marriage by isolating and discriminating against such persons in business transactions. *See* Amended Compl. ¶¶ 24, 29. The NJLAD expressly states that this discriminatory objective is unlawful. N.J.S.A. §§ 10:5–12*l*, m. Therefore, Director Stewart's representation that Plaintiff and others will not be prosecuted for boycotting or any other aiding and abetting discrimination in business transactions, unless it is directed toward an unlawful end, does not in any way insulate Plaintiff from prosecution. The parties' interests thus remain adverse

with respect to enforcement of N.J.S.A. § 10:5–12n.

With respect to N.J.S.A. section 10:5–12j, Director Stewart's supplemental affidavit represents that he has not promulgated any regulations requiring persons covered by the act to post notices informing the public that discrimination based upon "affectational or sexual orientation" is prohibited. The NJLAD authorizes the Director "by regulation [to] require" notice posting, but does not require him to do so. N.J.S.A. § 10:5–12j. Existing regulations require employers, real estate agents, and places of public accommodation to post notices informing the public that discrimination based upon traditionally protected characteristics, such as race, creed, color, or national origin is prohibited. N.J.A.C. §§ 13:8–1.1—13:8–2.3. Although Director Stewart has not promulgated a regulation adding "affectational or sexual orientation" to that list, the Division prepared new notices to reflect the 1992 amendments to the NJLAD and some of these notices were distributed. Stewart Supp.Aff. ¶ 17. Director Stewart ordered distribution stopped "because of the absence of regulatory authorization." Stewart Supp.Aff. ¶ 17. Therefore, Director Stewart contends, no one is currently required to post notices stating that discrimination based upon "affectational or sexual orientation" is illegal. Stewart Supp.Aff. ¶ 17.

Since no law or existing regulation requires Plaintiff and other OPC members to post notices indicating that discrimination based upon sexual orientation in employment, public accommodations, and real estate transactions is illegal, Plaintiff has failed to demonstrate that his interests are currently adverse to those of the Defendants. Plaintiff has submitted a notice prepared by the Division to reflect the 1992 amendments to the NJLAD. Pl.Br.Exh. 1. While this revised notice may suggest that Director Stewart intends to promulgate the necessary regulation, unless and until he does so, Plaintiff and other OPC members do not face a "real and immediate" threat of prosecution. *See Salvation Army,* 919 F.2d at 192. As a result, the parties do not possess adverse interests with respect to N.J.S.A. section 10:5–12j.

Therefore, this factor weighs against finding that Reverend Cummings has presented a ripe controversy challenging the notice posting provision of the NJLAD.

Having reviewed Director Stewart's supplemental affidavit, the Court concludes that the State has failed to eliminate Reverend Cummings' "real and immediate" threat of prosecution for violating N.J.S.A. sections 10:5–12e and n. *See Salvation Army,* 919 F.2d at 192. Therefore, the adversity of the parties' interests with respect to these two provisions weighs in favor of this Court finding that this controversy is ripe for review. *See Step–Saver Data Sys.,* 912 F.2d at 647. In contrast, the absence of such adversity of interests weighs against this Court issuing a decision on the merits of N.J.S.A. § 10:5–12j. *Id.*

### b. Conclusiveness

The second factor, conclusiveness, requires this Court to determine whether Plaintiff's claims are amenable to resolution "through a decree of conclusive character," or if a decision by this Court would amount to no more than an advisory opinion based upon a hypothetical set of facts. *Aetna Life Ins. Co.,* 300 U.S. at 240, 57 S.Ct. at 463–64; *see also Presbytery II,* 40 F.3d at 1468. While "predominantly legal questions are generally amenable to resolution in a pre-enforcement context," the presence of a purely legal question, in itself, does not render a case ripe for review. *See Presbytery II,* 40 F.3d at 1468 (citations omitted). In assessing the conclusiveness of judicial action, courts should consider whether the parties' claims are likely to change substantially in future litigation, whether "the current parties were appropriate to raise the issues at bar . . . [and whether] the parties would be subject to enforcement." *Id.* (citing *Atlanta Gas Light Co. v. United States Dept. of Energy,* 666 F.2d 1359, 1363 n. 7 (11th Cir.), *cert. denied,* 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 78 (1982).

Since Plaintiff mounts a facial challenge to constitutionality of these three NJLAD provisions, factual development would add little, if anything, to resolution of Plaintiff's First Amendment claims. *Presbytery II,* 40 F.3d at 1468, 1469. Moreover, Reverend Cum-

mings alleges that he and other OPC members currently engage in prohibited activities and intend to do so in the future. Future claims by Reverend Cummings or others sharing his desire to discriminate based upon sexual orientation "would most likely parallel those claims already presented ... [making it] unlikely that there would be any change in the substance or clarity of the challenges" to the NJLAD. *Id.* at 1469. As previously discussed, Reverend Cummings would be subject to prosecution under the aid and abet provisions, N.J.S.A. sections 10:5–12e and n, for the activities alleged in the Amended Complaint. In contrast, the notice posting provision, N.J.S.A. section 10:5–12j, could not be enforced against Reverend Cummings because existing regulations do not require him to post a notice stating that discrimination based upon "affectational or sexual orientation" is prohibited. Stewart Supp.Aff. ¶ 18.

Having assessed the applicable criteria, this Court concludes that the second *Step–Saver* factor, conclusivity, weighs in favor of finding that Plaintiff's challenges to the two aid and abet provisions, N.J.S.A. sections 10:5–12e and n are ripe for review. *See Step–Saver*, 912 F.2d at 649. In contrast, a decision on Reverend Cummings' challenge to the notice posting provision would be merely an advisory opinion, based upon a hypothetical regulation requiring him to post a notice stating that discrimination based upon sexual orientation is unlawful. Since no such regulation currently exists, Reverend Cummings would not be subject to prosecution for refusing to post a notice that is inconsistent with his religious beliefs. Therefore, the lack of conclusiveness weighs against finding that Reverend Cummings' challenge to N.J.S.A. section 10:5–12j is ripe for review.

#### c. *Utility*

In assessing the third *Step–Saver* factor, the utility resolving the facial challenge to a statute, a court should consider "whether the parties' plans of actions are likely to be affected by a declaratory judgment." *Step–Saver*, 912 F.2d at 649 n. 9. Entry of a declaratory judgment would affect the State's enforcement policies with respect to the aid and abet provisions. N.J.S.A. §§ 10:5–12e, n. Although Reverend Cummings alleges that he will continue to engage in allegedly prohibited activities in spite of the risk that he will be prosecuted, "his willingness to do so is likely to be affected by resolution of this action." *Presbytery II*, 40 F.3d at 1470. Since a declaration of Reverend Cummings' rights would permit him and "others who would seek to engage in similar activity ... to speak without fear of governmental sanction or regulation of their activities," this third *Step–Saver* factor weighs in favor of holding that Plaintiff's challenge to the aid and abet provisions of the NJLAD re ripe. *Id.*; N.J.S.A. §§ 10:5–12e, n.

With respect to the notice posting provision, however, a decision by this Court is unlikely to affect the parties' conduct. Most importantly, the State concedes that N.J.S.A. section 10:5–12j cannot be enforced against persons, like Reverend Cummings, who refuse to display a notice stating that discrimination based upon sexual orientation is unlawful. Since this refusal is not unlawful, Reverend Cummings' conduct and his willingness to refuse to post such a notice a notice would not be affected in any way by a judicial decision. As a result, the third *Step–Saver* factor weighs against finding Reverend Cummings' challenge to the notice posting provision ripe.

#### d. *Summary of Conclusions*

■ Having applied the three part test enunciated in *Step–Saver*, this Court concludes that Reverend Cummings' claims challenging the constitutionality of the aid and abet provisions, N.J.S.A. sections 10:5–12e and n, are ripe for adjudication.

■ In contrast, all three *Step–Saver* factors weigh against judicial action on Reverend Cummings' challenge to the notice posting provision, N.J.S.A. section 10:5–12j. As an additional consideration, the Court notes that the Division has, in the past, made exceptions to the notice posting requirements in its regulations. For example, the regulation requiring notices to be posted by persons engaged in the sale of real estate contains an exception for a person who either sells or attempts to sell his own residence.

N.J.A.C. § 13:8–1.3. The form which a regulation implementing the 1992 amendments takes, if any, could eliminate this controversy or " 'materially alter the question to be decided.' " *Renne,* 501 U.S. at 323, 111 S.Ct. at 2339. Consequently, a determination of the constitutionality of N.J.S.A. section 10:5–12j is best postponed "until a more concrete controversy arises." *See id.* Accordingly, Plaintiff's challenge to N.J.S.A. section 10:5–12j is **dismissed** as unripe.

### 2. Standing

 Like ripeness, standing is an outgrowth of the "case or controversy" requirement of Article III of the constitution. In order to invoke the jurisdiction of a federal court, a plaintiff must have "a personal stake in the outcome" of an otherwise justiciable controversy. *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), U.S. Const., art. III, § 2, cl. 2. "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' ... and that the injury 'fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision ...' " *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted).

 In addition to these three constitutional requirements for standing, the Supreme Court has also identified several prudential standing principles that require a federal court to decline jurisdiction. Even where a party has satisfied the constitutional case or controversy requirement, these prudential requirements dictate that "the Plaintiff must generally assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205.

The Supreme Court has recognized several exceptions to the general rule against third party standing. *E.g., Secretary of State of Maryland v. Joseph H. Munson Co., Inc.,* 467 U.S. 947, 957–59, 104 S.Ct. 2839, 2847–48,

81 L.Ed.2d 786 (1984) (permitting professional fundraiser to challenge statute requiring charities to use 75% of monies raised for charitable purposes, rather than administrative expenses.) [hereinafter *Munson* ]. Since a litigant who does not possess Article III standing cannot assert the rights of others, the Court must first determine whether Reverend Cummings possesses standing to sue in his own right. *See Amato v. Wilentz,* 952 F.2d 742, 749 (3d Cir.1991) (citations omitted).

#### a. Reverend Cummings' Standing

 In *Presbytery II,* the Third Circuit noted that its determination that Reverend Cummings faced a real and immediate threat of prosecution led necessarily to the conclusion that he possessed standing to bring this action on his own behalf. 40 F.3d at 1470 n. 14. The Third Circuit expressly left open the question, however, of whether Reverend Cummings possessed standing to challenge the 1992 amendments to the NJLAD on behalf of other OPC members. *Id.*.

According to the Defendants, Director Stewart's supplemental affidavit, by removing the threat that Reverend Cummings will be prosecuted for activities in his individual capacity, has eliminated Plaintiff's standing to bring this action either on in his own right or on behalf of OPC members. Since this Court has concluded that Reverend Cummings continues to face the threat of prosecution in spite of the supplemental affidavit, the Defendants' contention that he has lost standing lacks merit. *See id.* at 1470. The "real and immediate threat" of prosecution that Reverend Cummings faces constitutes a concrete injury capable of supporting standing. *See Northeastern Fla. Chapter of Assoc. General Contractors of Am. v. City of Jacksonville,* —— U.S. ——, ——–——, 113 S.Ct. 2297, 2301–02, 124 L.Ed.2d 586 (1993). Moreover, this injury is traceable to the challenged statutory provisions and is likely to be redressed by a favorable decision. *See id.* Therefore, the Third Circuit's conclusion that Reverend Cummings may sue in his own right remains valid.

### b. Third Party Standing

With respect to the issue left open by the Third Circuit, Reverend Cummings maintains that this Court should not apply the prudential bar against third party standing and instead should permit him to assert the rights of OPC members.

■ Based upon Supreme Court precedent, the Third Circuit has identified three factors to be considered in determining whether a litigant has third party standing to assert the rights of others not before the Court. *Amato,* 952 F.2d at 749 (citations omitted). Courts should balance the following factors: (1) "the relationship between the plaintiff and the third party whose rights are asserted;" (2) "the ability of the third party to advance his own rights—whether some obstacle impedes the rightholder's own suit;" and (3) "the impact on third party interests—whether plaintiff and the third party have consistent interests." *Id.* at 749, 750 (citing *Caplin & Drysdale v. United States,* 491 U.S. 617, 623 n. 3, 109 S.Ct. 2646, 2651 n. 3, 105 L.Ed.2d 528 (1989). Additionally, in the First Amendment context, the Supreme Court has held that the "fear of chilling expression . . . may at times outweigh the policies behind the general rule against third party standing." *Amato,* 952 F.2d at 748 (citing *Munson,* 467 U.S. at 977, 104 S.Ct. at 2857–58).

### 1) Relationship and Consistency of Interests

■ Although a close personal relationship is "neither necessary nor sufficient" to support third party standing, standing is more likely where the litigant and the third party possess some relationship "of special consequence." *Amato,* 952 F.2d at 751 (citations omitted). "The key aspects of the 'relationship' prong are thus a common link to the right asserted, consistency of the parties' interests, and effective advocacy—not the intimacy of the relationship per se." *Id.*

Since Reverend Cummings' claims in his official capacity have been dismissed, this Court must examine the relationship between Reverend Cummings as an individual and other OPC members. Reverend Cummings and other OPC members share a common link to their asserted right to aid and abet discrimination based upon affectational or sexual orientation: their shared belief that such behavior and advocacy is required by OPC doctrine. Moreover, the Amended Complaint alleges that Reverend Cummings and other OPC members have and intend to continue to engage in similar activities that may violate the aid and abet provisions of the NJLAD. *See* Amended Compl. ¶ 12 (stating that allegations regarding "plaintiff(s)" include OPC members). As adherents to a common belief system, Reverend Cummings and other OPC members possess consistent interests in being able to express their belief that "sexual sins," including homosexuality, bisexuality, and sex outside of marriage are wrong. Furthermore, Reverend Cummings has shown himself to be an effective advocate in challenging the 1992 amendments to the NJLAD as violating the First Amendment. Therefore, the relationship between Reverend Cummings and other OPC members and the consistency of their interests both weigh in favor of third party standing.

### 2. Obstacles

■ Third party standing may be inappropriate where the party whose rights have allegedly been violated faces some impediment from bringing his or her own suit. *Id.* at 750. Such impediments range from "legal or physical inability to bring suit," which qualifies as an obstacle, to "a practical disincentive to sue . . . [which] may suffice although a mere disincentive makes for a less persuasive showing than an affirmative impediment." *Id.* (citations omitted).

Along the spectrum of impediments, those faced by OPC members fall close to the practical disincentive end, which does not necessarily suffice to support third party standing. Plaintiff does not allege that individual OPC members face any legal or physical inability to bring suit. Rather, he claims that the 1992 amendments to the NJLAD, adding affectational and sexual orientation to the list of protected characteristics have stigmatized OPC members for believing in and advocating discrimination based upon an individual's sexual practices. *See* Amended Compl. ¶ 10. In other words, Reverend

Cummings implicitly argues that the unpopularity of OPC members' beliefs impedes them from coming forward to assert their own First Amendment rights.

While this relatively mild disincentive might ordinary weigh against third party standing, in the First Amendment context, the lack of an obstacle is not dispositive in determining standing to challenge a statute as chilling free speech. *Munson,* 467 U.S. at 957, 104 S.Ct. at 2847. Therefore, even though other OPC members do not face a substantial obstacle to filing their own suits, the absence of such an impediment is not dispositive.

### 3) Conclusions

■ Balancing these relevant factors leads this Court to conclude that Reverend Cummings possesses third party standing to assert the First Amendment rights of other OPC members. The relationship between the parties, the consistency of their interests, and concern for the alleged chilling effect of the challenged NJLAD provisions weigh strongly in favor of third party standing.

### C. Pullman Abstention

In an attempt to prevent this Court from adjudicating the merits of Plaintiff's challenge, the Defendants argue that this Court should *Pullman* abstain in order to provide the New Jersey Supreme Court an opportunity to construe the two aid and abet provisions, N.J.S.A. sections 10:5–12e and n.

■ "Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). The Supreme Court has characterized abstention as:

> an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest.

*County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959).

■ Under *Pullman* abstention doctrine, where a federal court faces "both a federal constitutional question and an unsettled issue of state law whose resolution might narrow or eliminate the federal constitutional question, abstention may be justified under principles of comity in order to avoid 'needless friction with state policies.'" *Chez Sez III Corp. v. Township of Union,* 945 F.2d 628, 631 (3d Cir.1991), *cert. denied,* 503 U.S. 907, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992) (quoting *Pullman,* 312 U.S. at 500, 61 S.Ct. at 645). By abstaining under *Pullman,* a court does not abdicate federal jurisdiction but merely postpones its exercise, thus avoiding unnecessary federal constitutional adjudication. *Harrison v. NAACP,* 360 U.S. 167, 177, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959) (citations omitted). According to the Third Circuit, district courts must engage in a two-step analysis to decide whether to abstain under *Pullman.* First, a court must determine whether three "special circumstances" exist:

> (1) Uncertain issues of state law underlying the federal constitutional claims brought in federal court;
>
> (2) State law issues amenable to a state court interpretation that would obviate the need for, or substantially narrow, the scope of adjudication of the constitutional claims;
>
> (3) A federal court's erroneous construction of state law would be disruptive of important state policies.

*Hughes v. Lipscher,* 906 F.2d 961, 964 (3d Cir.1990). Second, if all three special circumstances exist, the district court "must then make a discretionary determination as to whether abstention is in fact appropriate under the circumstances of the particular case, based upon the weight of these criteria and other relevant factors." *Chez Sez,* 945 F.2d at 631. Other relevant factors include: "the availability of an adequate state remedy, the length of time the litigation has been pending, and the potential impact on the parties caused by delay in obtaining a state ruling." *Stretton v. Disciplinary Bd. of the*

*Supreme Court of Pennsylvania,* 944 F.2d 137, 140 (3d Cir.1991); *Biegenwald v. Fauver,* 882 F.2d 748, 750 (3d Cir.1989).

### 1. *Uncertainty of State Law*

■ Before *Pullman* can apply, the state statute or local ordinance subject to federal constitutional challenge must be uncertain or ambiguous. Initially, a court should focus on whether the statutory language is "clear and unmistakable." *Hughes,* 906 F.2d at 965.

Both the Defendants and Reverend Cummings agree that the aid and abet provisions of the NJLAD are ambiguous. *See* N.J.S.A. §§ 10:5–12e, n. In fact, the Defendants' request for this Court to abstain is based upon the concession that key statutory provisions are not defined under the Act and are thus ambiguous. The NJLAD does not define aiding, abetting, coercing, or any of the other behavior that can trigger a violation of N.J.S.A. sections 10:5–12e and n. *See* N.J.S.A. § 10:5–5. Similarly, Reverend Cummings indicates that this declaratory judgment action stems from his uncertainty concerning the meaning of these statutory provisions, which has allegedly had chilling effect upon his advocacy in favor of discrimination based upon affectational and sexual orientation. Cummings Aff. ¶ 8 ("I do not know what these terms as used in the law are supposed to mean.").

■ Where the state courts have authoritatively construed an otherwise ambiguous statute, abstention is not appropriate. *United Services Auto Ass'n v. Muir,* 792 F.2d 356, 361 (3d Cir.1986), *cert. denied, Grode v. United Services Auto Ass'n,* 479 U.S. 1031, 107 S.Ct. 875, 93 L.Ed.2d 830 (1987) (citing *Kusper v. Pontikes,* 414 U.S. 51, 55–56, 94 S.Ct. 303, 306–07, 38 L.Ed.2d 260 (1973)). Consequently, a court should not abstain where a prior authoritative state court decision forecloses the narrowing interpretation of the challenged statute offered by the party arguing in favor of abstention. *Kusper,* 414 U.S. at 55, 94 S.Ct. at 306–07. In contrast, an administrative interpretation of a statute, because it is not authoritative, cannot remove an ambiguity and prevent abstention under *Pullman. United Services Auto Ass'n,* 792

F.2d at 361; *accord Chez Sez,* 945 F.2d at 632.

Since Director Stewart's clarifying interpretations cannot authoritatively resolve statutory ambiguities, the Court must determine whether prior New Jersey Supreme Court decisions foreclose an interpretation of either N.J.S.A. section 10:5–12e or n that would avoid the need for a decision on Plaintiff's constitutional claims.

With respect to N.J.S.A. section 10:5–12n, which prohibits aiding and abetting discrimination in business transactions, including through boycotting, this provision has never been interpreted by the New Jersey Supreme Court. The parties have not cited any published decision by a New Jersey court interpreting this provision nor has the Court's independent research uncovered any such opinions.

Regarding N.J.S.A. section 10:5–12e, however, the New Jersey Supreme Court has interpreted this provision specifically in the context of a First Amendment challenge. *The Passaic Daily News Corp. v. Blair,* 63 N.J. 474, 308 A.2d 649 (1973). Several newspapers challenged an administrative regulation prohibiting publication of employment ads under column headings segregated by gender or any other characteristic protected by the NJLAD. *Id.* at 478, 308 A.2d 649. In addition, the regulation declared it a violation of the NJLAD to publish any employment ad that either directly or indirectly expressed an intent to discriminate against persons based upon protected characteristics like sex, unless the preference was based upon a bona fide occupational qualification. *Id.*

Characterizing the employment ads as commercial speech, the New Jersey Supreme Court held that the regulation prohibiting newspapers from segregating employment ads by gender did not unconstitutionally abridge freedom of the press under the First Amendment. *Id.* at 481, 308 A.2d 649. Moreover, the New Jersey Supreme Court held that the challenged regulations fell within the Division's rule-making authority conferred by the NJLAD. *Id.* at 490, 308 A.2d 649. In so doing, the Court interpreted the term "aiding," as used in N.J.S.A. section 10:5–12e. *Id.* at 488, 308 A.2d 649. The

Court concluded that "[t]o borrow ... from definitions of aiding and abetting in the criminal field, where criminal intent is stressed because the abettor is a criminal principal, is entirely inappropriate in the context of the present statute which is basically a remedial, not a criminal one." *Id.; but see Baliko v. Stecker,* 275 N.J.Super. 182, 191, 645 A.2d 1218 (App.Div.1994) (relying upon the criminal definition of aiding and abetting in construing N.J.S.A. section 10:5–12e).

Although the New Jersey Supreme Court has interpreted N.J.S.A. section 10:5–12e, its interpretation does not foreclose any of the constructions proposed by Director Stewart to narrow or to eliminate Plaintiff's federal constitutional claims. Most importantly, *The Passaic Daily News* upheld the constitutionality of a regulation implementing N.J.S.A. section 10:5–12e as applied to commercial speech. *Id.* 63 N.J. at 481–82, 308 A.2d 649. Commercial speech is entitled to substantially less constitutional protection than the politically and religiously motivated speech that Reverend Cummings and other OPC members allegedly engage in by speaking out against the NJLAD and "sexual sins." *See e.g., Central Hudson Gas & Electric v. Public Service Comm'n,* 447 U.S. 557, 562–63, 100 S.Ct. 2343, 2349–50, 65 L.Ed.2d 341 (1980); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 388–89, 93 S.Ct. 2553, 2560–61, 37 L.Ed.2d 669 (1973) (holding that speech related to illegal commercial activity, discrimination in employment, is not constitutionally protected).

Since *Passaic Daily News* involved commercial speech, it does not dictate a particular outcome for Plaintiff's First Amendment challenge to the aid and abet provisions of the NJLAD. *See* N.J.S.A. §§ 10:5–12e, n. Moreover, the New Jersey Supreme Court's interpretation of N.J.S.A. section 10:5–12e does not foreclose Director Stewart's proposed limiting construction of the challenged aid and abet provisions as inapplicable to "pure" First Amendment protected speech that is not accompanied by conduct in violation of the NJLAD. *See* Stewart Supp.Aff. ¶¶ 6, 14.

In the absence of any New Jersey Supreme Court decision construing the applica-bility of the challenged provisions to religiously or politically motivated speech or expressive conduct, the Court concludes that meaning of aiding and abetting discrimination under N.J.S.A. sections 10:5–12 e and n is uncertain and weighs in favor of *Pullman* abstention. *See Hughes,* 906 F.2d at 964.

### 2. Effect of State Law on the Constitutional Claim

As a second factor in the *Pullman* inquiry, courts should consider whether the challenged statute is "amenable to an interpretation by the state courts that would obviate the need for or substantially narrow the scope of the constitutional issues." *Chez Sez,* 945 F.2d at 632 (citations omitted). Although an administrative interpretation of a challenged provision cannot authoritatively eliminate uncertainty, an administrative interpretation that narrows or moots the federal constitutional challenge weighs in favor of abstention. *United Services Auto Ass'n,* 792 F.2d at 361 (citing *Bellotti v. Baird,* 428 U.S. 132, 148, 96 S.Ct. 2857, 2866–67, 49 L.Ed.2d 844 (1976)).

As Director Stewart's supplemental affidavit indicates, the challenged aid and abet provisions of the NJLAD, N.J.S.A. sections 10:5–12e and n, are subject to interpretations that would either eliminate or substantially narrow the constitutional issues presented. At a minimum, Director Stewart's supplemental affidavit shows that the two challenged NJLAD provisions can be construed as not prohibiting constitutionally protected "pure" speech. If the New Jersey Supreme Court were to adopt this interpretation, it would eliminate Reverend Cummings' claims that the NJLAD unconstitutionally prohibits him from "speaking out" against "sexual sins" and advocating discrimination against homosexuals, bisexuals, and heterosexuals engaged in sex outside of marriage. Reverend Cummings' challenge would then be narrowed to a determination of whether expressive conduct, like publishing and distributing leaflets, can constitutionally be actionable as unlawful aiding and abetting under the NJLAD.

Under New Jersey law, courts afford the interpretation of a statute by the

administrative agency charged with its enforcement special deference. *Passaic Daily News,* 63 N.J. at 484, 308 A.2d 649 ("placing considerable weight upon the construction of a statute ... by the administrative agency charged by the statute with the responsibility of making it work."). The administrative agency's interpretation "is entitled to prevail, so long as it is not plainly unreasonable". *E.g., Metromedia Inc. v. Director, Div. of Taxation,* 97 N.J. 313, 327, 478 A.2d 742 (1984). Therefore, there is a significant chance that given the opportunity, the New Jersey Supreme Court would adopt the narrowing constructions of N.J.S.A. sections 10:5–12e and n contained in Director Stewart's supplemental affidavit.

Even if the New Jersey Supreme Court did not adopt Director Stewart's precise interpretation, his supplemental affidavit shows that both N.J.S.A. sections 10:5–12e and n are susceptible to limiting constructions that could substantially alter, narrow, and even eliminate Reverend Cummings' First Amendment claims. The amenability of the challenged provisions to narrowing constructions weighs in favor of *Pullman* abstention. *See Hughes,* 906 F.2d at 964.

### 3. Effect of an Erroneous Federal Interpretation of State Law

Regarding the third factor, a federal court must examine the importance of the state policies underlying the challenged statute and the potential disruption that would result from an erroneous ruling. *Hughes,* 906 F.2d at 964.

The New Jersey Legislature, in its statement of findings, emphasized the importance of the State policies embodied in the NJLAD by declaring that discrimination based against categories of persons protected by the NJLAD "threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State." N.J.S.A. § 10:5–3.

Similarly, the New Jersey Supreme Court has stated that:

> The Law Against Discrimination, and the constitutional precepts of equal rights which it vindicates, reflect a pervasive public policy. Its objectives are constant and have a vital place throughout the panoply of state laws and actions.

*Terry v. Mercer County Board of Chosen Freeholders,* 86 N.J. 141, 151, 430 A.2d 194 (1981) (citations omitted).

Given the "preeminent social significance of its [the NJLAD's] purposes and objectives," an erroneous interpretation by this Court would disrupt extremely important state policies. *Passaic Daily News,* 63 N.J. at 484, 308 A.2d 649 (citations omitted). The importance of New Jersey's policy of eradicating "the cancer of discrimination" and the disruption that an erroneous decision by this federal court would cause weigh in favor of abstention. *Jackson v. Concord Co.,* 54 N.J. 113, 124, 253 A.2d 793 (1969); *see Hughes,* 906 F.2d at 964.

### 4. Equitable Considerations

Finally, as additional factors relevant to the *Pullman* abstention inquiry, courts should consider the relative weight of the first three criteria, as well as additional factors such as the availability of adequate state court remedies and the consequences of the delay caused by a decision to abstain. *See e.g, Stretton,* 944 F.2d at 140.

With respect to the three abstention criteria already discussed, the Court finds that all weigh strongly in favor of abstention. In addition, New Jersey law provides an adequate remedy whereby Reverend Cummings could obtain a declaratory ruling on his constitutional claims. New Jersey law provides that any person whose rights are affected "may have determined any question of construction or validity" arising under the challenged state law. N.J.S.A. § 2A:16–53. The availability of declaratory relief under New Jersey law weighs in favor of abstention.

Admittedly, if this Court decided to abstain, this action, which has already been pending for over three years, would be delayed still further. According to Plaintiff, the harm to him and to other OPC members that would result from a decision to abstain, deferring a decision on the merits of this First Amendment challenge alone is sufficient to render abstention inappropriate.

■ Even where all three special circumstances for abstention exist, courts may refuse to abstain if the resulting delay would cause irreparable harm to the parties. *Id.* at 141; *Biegenwald,* 882 F.2d at 753–54. Where a candidate for state judicial office mounted a challenge to the Pennsylvania Code of Judicial Conduct which prohibited him from announcing his views on disputed political or legal issues, the potential harm caused by a delayed decision on the merits rendered abstention inappropriate. *Stretton,* 944 F.2d at 141. With only a few weeks remaining before the election, a timely state court decision probably could not be obtained, leaving the plaintiff and other candidates in doubt about appropriate topics for campaign discussion. *Id.* Similarly, the disadvantages of abstaining significantly outweighed the advantages where the plaintiff, a death row inmate, might not be alive by the time the state judicial process had run its course and the litigation returned to federal court for resolution. *Biegenwald,* 882 F.2d at 753. Since the delay caused by the decision to abstain would, as a practical matter, deprive the death row inmate of any possible remedy for the alleged constitutional violations, abstention was inappropriate. *Id.* Both of these cases demonstrate that the harm caused by a delayed decision must be truly extraordinary in order to render abstention inappropriate.

Determining whether the harm to Reverend Cummings that would result from a delayed decision meets this high threshold raises unique First Amendment concerns. In the First Amendment context, the harm of a delayed decision and therefore the appropriateness of *Pullman* abstention varies, depending upon whether the plaintiff challenges the relevant statute on its face or as applied. *Chez Sez,* 945 F.2d at 633–34. The Supreme Court has held that " 'abstention ... is inappropriate for cases [where] ... statutes are justifiably attacked on their face as abridging free expression.' " *City of Houston v. Hill,* 482 U.S. 451, 467, 107 S.Ct. 2502, 2513, 96 L.Ed.2d 398 (1987) (quoting *Dombrowski v. Pfister,* 380 U.S. 479, 489–90, 85 S.Ct. 1116, 1122, 14 L.Ed.2d 22).

Distinguishing between facial and as applied challenges makes sense under the Third Circuit's two-step *Pullman* analysis. *See Chez Sez,* 945 F.2d at 633. If a statute is justifiably attacked on its face, then it is not susceptible to a limiting construction that would eliminate or alter the federal constitutional question presented, and thus the first "special circumstance" criterion for *Pullman* abstention is not met. *See Hughes,* 906 F.2d at 964. Furthermore, if the challenged statute is in fact invalid on its face, then the delay resulting from a decision to abstain would cause an extremely harmful chilling effect, a discretionary consideration that would weigh strongly in favor of immediate judicial intervention. *See, e.g., Stretton,* 944 F.2d at 140.

In contrast, a plaintiff, by challenging a statute as applied, does not raise such concerns. "Where the state courts can, in a single proceeding, determine the bounds of the state statute by choosing between one of several alternative meanings of the statute, abstention has been held proper even where a First Amendment challenge is concerned." *Chez Sez,* 945 F.2d at 634 (citing *Babbitt v. United Farm Workers,* 442 U.S. 289, 308, 99 S.Ct. 2301, 2314, 60 L.Ed.2d 895 (1979)). *Pullman* abstention is not inappropriate per se simply because a statute is being challenged on First Amendment grounds. *Id.*

Moreover, New Jersey law provides a specific mechanism that could substantially mitigate the harm or chilling effect for an individual awaiting a state court determination of whether a challenged statute is constitutional as applied to him. Under New Jersey law, an individual may seek a binding declaratory ruling from the appropriate administrative agency concerning the applicability of the challenged statute to specific persons or conduct. N.J.S.A. § 52:14B–8. If this Court were to abstain, Reverend Cummings could avail himself of this administrative procedure while his claims were pending in state court. By seeking a declaratory ruling from the Division, Reverend Cummings could eliminate much of the harm caused by his alleged uncertainty as to whether his religiously and politically motivated speech and expressive conduct violate the NJLAD.

Although Reverend Cummings has mounted a facial challenge to N.J.S.A. sections 10:5–12e and n, this does not end the Court's abstention inquiry. According to the Supreme Court, *Pullman* abstention is inappropriate where a plaintiff "justifiably" mounts a facial challenge to a statute. *City of Houston*, 482 U.S. at 467, 107 S.Ct. at 2512 (quoting *Dombrowski*, 380 U.S. at 489–90, 85 S.Ct. at 1122–23). Therefore, this Court must assess the viability of Reverend Cummings' facial challenges to the NJLAD's two aid and abet provisions before making any final determination regarding abstention. If Reverend Cummings' facial challenges are entirely without merit, then there is an increased likelihood that *Pullman* abstention will be appropriate for his remaining claims, challenging the two provisions, N.J.S.A. sections 10:5–12e and n as they apply to him. *See Chez Sez*, 945 F.2d at 633–34.

### D. Reverend Cummings' Facial Challenge

Reverend Cummings contends that N.J.S.A. sections 10:5–12e and n, which prohibit aiding and abetting discrimination against persons based upon affectational or sexual orientation, are unconstitutional on their face and thus should be declared invalid. According to Reverend Cummings, the challenged provisions are unconstitutional on their face for two reasons: (1) they are unconstitutionally vague and overbroad; and (2) they are content-based regulations which impermissibly discriminate against disfavored viewpoints, such as Reverend Cummings' belief that people should be discriminated against based upon their sexual orientation. Both of these theories for facially invalidating the challenged aid and abet provisions lack merit.

#### 1. Overbreadth

The overbreadth doctrine embodies the principle that the First Amendment "needs breathing space" and "that the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that the protected speech of others may be muted and perceived grievances left to fester because of the possibly inhibitory effects of overly broad statutes." *Broadrick v. Oklahoma*, 413 U.S.

601, 611, 612, 93 S.Ct. 2908, 2915, 2916, 37 L.Ed.2d 830 (1973).

In an existing case or controversy, the overbreadth doctrine permits "a litigant whose own activities are unprotected ... nevertheless [to] challenge a statute by showing that it substantially abridges the rights of other parties not before the Court." *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980); *accord Dombrowski*, 380 U.S. at 486, 85 S.Ct. at 1120–21 (holding that overbreadth doctrine does not require "that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.").

A successful overbreadth challenge precludes enforcement of a challenged statute unless and until it is either rewritten by the legislature or authoritatively reinterpreted by a state court to remove the chilling effect upon constitutionally protected expression. *Broadrick*, 413 U.S. at 613, 93 S.Ct. at 2916. Consequently, "[a]pplication of the overbreadth doctrine ... is, manifestly, strong medicine" that should be employed to invalidate an entire statute only where the statute's overbreadth is not only "real, but substantial as well, judged in relation to the statute's plainly legitimate sweep," *id.*, and where the statute is not susceptible to a limiting construction or partial invalidation. *Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987) [hereinafter *Airport Commissioners*]. "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render its susceptible to an overbreadth challenge." *City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984) [hereinafter *Taxpayers for Vincent*].

As a guiding principle, federal courts should "never formulate a rule of constitutional law broader than is required by the precise facts to which it is applied." *United States v. Raines*, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960) (citations omit-

ted). For this reason, courts should not ordinarily invalidate statutes as facially overbroad "where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish." *Brockett v. Spokane Arcades,* 472 U.S. 491, 504, 105 S.Ct. 2794, 2802, 86 L.Ed.2d 394 (1985). In such cases, there is:

> no want of a proper party to challenge the statute, no concern that an attack on the statute will be unduly delayed or protected speech discouraged. The statute may be declared invalid to the extent that it reaches *too far,* but otherwise left intact.

*Id.*

■ Unless it appears that "any attempt to enforce" the challenged legislation "would create an unacceptable risk of the suppression of ideas," a court should declare an entire statute invalid on its face only if the record indicates that the challenged statute will have a different impact upon third parties not before the court than it has upon the plaintiffs. *Taxpayers for Vincent,* 466 U.S. at 801, 104 S.Ct. at 2126–27; *see also* Laurence H. Tribe, *American Constitutional Law,* § 12–28 (2d ed. 1988) (noting the Supreme Court's increasingly unwillingness to assume the existence of a chilling effect, instead placing "a mounting burden on the *individual* to show that the apparent inhibition of free expression is in fact highly probable and socially significant."). Courts should not engage in overbreadth analysis where a plaintiff claims that a statute is overbroad precisely because it applies to him. *Moore v. City of Kilgore,* 877 F.2d 364, 390–92 (5th Cir.1989), *cert. denied,* 493 U.S. 1003, 110 S.Ct. 562, 107 L.Ed.2d 557 (1989) (Higginbotham, J., concurring).

First, it is not true that "any attempt to enforce" the challenged provisions of the NJLAD "would create an unacceptable risk of the suppression of ideas." *See id.* Even if the challenged provisions of the NJLAD prohibit speech advocating discrimination, as Reverend Cummings claims, the provisions also encompass conduct that the State may legitimately prohibit. For example, the State could permissibly prohibit, for example, an individual from offering a $500 reward to employers for each time that they refuse to hire a gay or lesbian job applicant because of the applicant's sexual orientation. Such a reward scheme would have little to do with the expression of ideas and could legitimately be regulated by the state because of the secondary effects of such conduct. Therefore, Reverend Cummings cannot bring an overbreadth challenge on the ground that the two challenged provisions are not capable of constitutional application. *See id.*

Second, Reverend Cummings has failed to establish that the challenged aid and abet provisions would have any different effect on third parties not before the Court than it has on himself. The Amended Complaint indicates that where its allegations refer to "Plaintiffs," this term includes not only Reverend Cummings but also OPC members. Amended Compl. ¶ 12. To the extent the Amended Complaint asserts claims by Reverend Cummings in his individual, as opposed to his official capacity as a minister, the allegedly prohibited aiding and abetting activities that he and other OPC members engage in and intend to continue are identical. In so doing, Reverend Cummings has failed to overcome the presumption that this Court should assess the constitutionality of N.J.S.A. sections 10:5–12e and n as they apply to him, as opposed to on their face. This Court expresses no opinion as to whether the challenged aid and abet provisions are in fact overbroad. Reverend Cummings has failed, however, properly to assert such a challenge.

### 2. Viewpoint Discrimination

■ As explained by the Supreme Court, "[t]here is an 'equality of status in the field of ideas,' and government must afford all points of view an equal opportunity to be heard." *Police Dep't v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) (citation omitted). "[T]he First Amendment's hostility to content-based regulation extends not only to a restriction on a particular viewpoint, but also to a prohibition of public discussion on an entire topic." *Burson v. Freeman,* 504 U.S. 191, 197, 112 S.Ct. 1846, 1850, 119 L.Ed.2d 5 (1992); *R.A.V. v. City of St. Paul,* 505 U.S. 377, 381–93, 112 S.Ct. 2538, 2542–48, 120 L.Ed.2d 305 (1992).

Applied to expressive conduct, the preference for content-neutrality permits "nonverbal expressive activity [to] be banned because of the action it entails, but not because of the ideas that it expresses." *R.A.V.,* 505 U.S. at 385, 112 S.Ct. at 2544; *Texas v. Johnson,* 491 U.S. 397, 406, 109 S.Ct. 2533, 2540, 105 L.Ed.2d 342 (1989). As long as the expressive conduct is not regulated because its message, "acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *R.A.V.,* 505 U.S. at 390, 112 S.Ct. at 2546–47.

 "Content-based regulations [of speech and expressive conduct] are presumptively invalid." *R.A.V.,* 505 U.S. at 382, 112 S.Ct. at 2542 (citing *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991)). Consequently, courts, as the first step in a First Amendment analysis, must determine whether a statute is content-neutral or content-based. *Rappa v. New Castle County,* 18 F.3d 1043, 1053 (3d Cir.1994). The level of constitutional scrutiny applied to a challenged regulation depends upon this determination. If a statute is content-based, it is unconstitutional unless the State can show that it "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n.,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983); *accord Burson,* 504 U.S. at 198, 112 S.Ct. at 1851. In contrast, courts apply a more relaxed level of scrutiny to content-neutral restrictions, which will be upheld "so long as they are designed to serve a substantial government interest and do not unreasonably limit alternative avenues of communication." *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986) (citations omitted).

 "Government regulation of expressive activity is content neutral so long as it is *'justified* without reference to the content of the regulated speech.'" *Id.* at 48, 106 S.Ct. at 929 (citations omitted). Where a statute is "aimed not at the *content*" of the restricted speech but "at the *secondary effects*" generated by or associated with the speech, the statute is content-neutral. *Renton,* 475 U.S. at 47, 106 S.Ct. at 929; *see also Boos v. Barry,* 485 U.S. 312, 320, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988). For this reason, the Supreme Court upheld a city zoning ordinance restricting the location of adult movie theaters, but not other types of theaters, as content-neutral, because the ordinance targeted the secondary effects of adult movie theaters, such as crime and diminished property values, not the content of the adult films themselves. *Id.* 475 U.S. at 47–49, 106 S.Ct. at 928–30. As a long as a statute "serves purposes unrelated to the content of expression," it is content-neutral, "even if it has an incidental effect upon some speakers or messages but not others." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989) (citing *Renton,* 475 U.S. at 47–49, 106 S.Ct. at 928–30).

Elaborating upon the secondary effects doctrine, the Supreme Court has indicated that "[l]isteners' reactions to speech ... [or] [t]he emotive impact of speech upon its audience is not a secondary effect" capable of supporting a finding of content-neutrality. *R.A.V.,* 505 U.S. at 394, 112 S.Ct. at 2549 (quoting *Boos,* 485 U.S. at 321, 108 S.Ct. at 1163–64).[3]

According to Plaintiff, the NJLAD discriminates based upon both content and viewpoint. Plaintiff argues that the provisions of the NJLAD:

impose severe disabilities upon the religious viewpoint that homosexuality, bisexuality and adultery—the protected sexual preferences—are behaviorally (as opposed to genetically) determined, and are sinful and immoral ... while speech supporting the sexually "permissive" and "expansive" viewpoint is not similarly burdened, but actually favored and protected ...

Pl.Br. at 23. Specifically, Plaintiff maintains that the NJLAD violates the prohibitions

---

**3.** The Third Circuit recently questioned whether the secondary effects doctrine applies at all to political speech. *Rappa,* 18 F.3d at 1069 (noting that only a plurality of the Supreme Court approved application of the doctrine to political speech in *Boos,* 485 U.S. at 320–21, 108 S.Ct. at 1163–64).

against content and viewpoint discrimination set forth in *R.A.V.*, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305.

Unlike the statute at issue in *R.A.V.*, which expressly applied to symbolic speech, including burning crosses and swastikas, as well as ordinary speech such as ethnically derogatory "appellations," the challenged provisions of the NJLAD, sections 10:5–12e and n, do not expressly regulate speech. *Compare* Minn.Legis.Code § 292.02 (1990) (quoted in *R.A.V.*, 505 U.S. at 378–80, 112 S.Ct. at 2541) *with* N.J.S.A. §§ 10:5–12e,n. Rather, the challenged NJLAD provisions prohibit the conduct of aiding and abetting discrimination in violation of the NJLAD. *See* N.J.S.A. §§ 10:5–12e, n. Director Stewart's supplemental affidavit construing the challenged provisions provides further support for this characterization.

▆▆▆▆ Although an administrative interpretation of a challenged regulation cannot remove an ambiguity for *Pullman* purposes, courts should consider a limiting construction by an administrative agency charged with enforcement of the challenged regulation in assessing its constitutionality on its face. *Ward*, 491 U.S. at 796, 109 S.Ct. at 2756–57 (citations omitted); *Kolender v. Lawson*, 461 U.S. 352, 355, 103 S.Ct. 1855, 1857, 75 L.Ed.2d 903 (1983) (citing *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 1191 n. 5, 71 L.Ed.2d 362 (1982).

As Director Stewart's interpretation makes clear, the challenged NJLAD provisions are directed primarily toward regulating discriminatory conduct and apply to speech activities only incidentally. Under Director Stewart's interpretation, the NJLAD prohibits: (1) "pure" speech that falls outside of the First Amendment's protection for a reason other than its discriminatory content; and (2) speech that is accompanied by conduct violative of the NJLAD. Stewart Supp.Aff. ¶¶ 6, 14. Specifically, Director Stewart has construed the prohibition against aiding and abetting as inapplicable to advocacy against the NJLAD and those classes of persons, including homosexuals, which the NJLAD protects. Instead, unlawful aiding and abetting "requires action

which assists, supports, and supplements the action of another in conduct" that violates the NJLAD. Stewart Supp.Aff. ¶ 12.

As a result of Director Stewart's narrowing construction, the potential overlap between the challenged aid and abet provisions and speech activities is in fact quite narrow. "Pure" speech that is otherwise entitled to First Amendment protection is not subject to prosecution. Liability under the NJLAD attaches only speech that is " 'directed to inciting or producing imminent lawless action and is likely to produce such action,' " which is not entitled to First Amendment protection. Stewart Supp.Aff. ¶ 14 (citing *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (per curiam). As Justice Scalia noted in *R.A.V*,

[S]ince words can in some circumstances violate laws directed not against speech but against conduct (a law against treason, for example, is violated by telling the enemy the nation's defense secrets), a particular content-based subcategory of a proscribable class of speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech.

*R.A.V.*, 505 U.S. at 389, 112 S.Ct. at 2546 (citations omitted). As an example, Justice Scalia indicated that "sexually derogatory 'fighting words,' among other words, may produce a violation of Title VII's general prohibition against discrimination in employment practices." Therefore, as long as section 10:5–12e permissibly regulates conduct or secondary effects, rather than expression, New Jersey may impose liability for content-based subcategory of constitutionally unprotected incitement to unlawfully discriminate against persons based upon their affectational or sexual orientation.

Dissemination of ideas committed to writing involves both speech and conduct. While Director Stewart's supplemental affidavit indicates that Reverend Cummings and others will not be prosecuted because of the ideas expressed in written materials, as this Court indicated in its discussion of ripeness, section II.B.1, *supra*, the State's interpretation does not waive prosecution for the conduct component of this speech activity, the printing and distribution of written materials. Printing

and distribution activities apparently qualify as unlawful aiding and abetting under the NJLAD as construed by Director Stewart. *See* Stewart Supp.Aff. ¶ 12. This Court must now assess whether the challenged NJLAD provisions impermissibly regulate this conduct based upon the message conveyed. *See R.A.V.*, 505 U.S. at 385–86, 112 S.Ct. at 2544.

In two recent opinions, the Supreme Court, in dicta, has characterized Title VII, which prohibits discrimination in employment based upon " 'race, color, religion, sex, or national origin' ... an example of a permissible content-neutral regulation of conduct." *Wisconsin v. Mitchell*, —— U.S. ——, ——, 113 S.Ct. 2194, 2200, 124 L.Ed.2d 436 (1993) (quoting 42 U.S.C. § 2000e–2(a)(1)); *R.A.V.*, 505 U.S. at 388–89, 112 S.Ct. at 2546. Without providing any analysis, the Supreme Court made this characterization, while acknowledging that Title VII may be violated by words that create a hostile work environment. *Id.* In fact, Justice Scalia cited Title VII as an example of a content-neutral regulation of the "secondary effects" of speech, justified without reference to the message of the speech or expressive conduct. *Id.* at 388–91, 112 S.Ct. at 2546–47 (citing *Renton*, 475 U.S. at 48, 106 S.Ct. at 929).[4]

Similarly, the Second Circuit Court of Appeals recently upheld a New York statute prohibiting aiding and abetting discrimination in access to public accommodations as a permissible regulation of conduct that only incidentally infringed upon the First Amendment rights of a religious group. *Jews for Jesus, Inc. v. Jewish Community Relations Council of New York*, 968 F.2d 286, 295 (2d Cir.1992) (citing *United States v. O'Brien*, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968)) [*hereinafter Jewish Community Relations Council*] (holding that Jewish organization that had allegedly economically coerced resort into cancelling its contract with Jews for Jesus organization could not evade liability on grounds that conduct was protected by First Amendment).

Consequently, the Second Circuit applied the *O'Brien* test, under which a statute will be upheld:

"if it is within the constitutional power of the Government; if it furthers an important or substantial government interest; if the government interest is unrelated to the suppression of free expression; and if the incidental restriction of First Amendment freedoms is no greater than is essential to the furtherance of that interest."

*Jewish Community Relations Council*, 968 F.2d at 295 (quoting *O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1679).

---

4. Among academics, the Supreme Court's characterization of Title VII as content-neutral regulation of conduct or "secondary effects" has received substantial criticism and discussion. *E.g.*, Kingsley R. Browne, *Title VII as Censorship: Hostile Environment Harassment and the First Amendment*, 52 OHIO STATE L.J. 481 (1991); Eugene Volokh, *Freedom of Speech and Workplace Harassment*, 39 U.C.L.A.L.REV. 1791 (1992); Suzanne Sangree, *Title VII Prohibitions Against Hostile Environment Sexual Harassment: No Collision in Sight*, 47 RUTGERS L.REV. 461 (1995). Applied in the context of Title VII, secondary effects analysis suggests that governments may target discriminatory conduct because it excludes women and minorities from the workplace and thus denies them equal employment opportunities. This discriminatory conduct should not be insulated simply because it is achieved through spoken words. *See id.* ("acts are not shielded from regulation merely because they express a discriminatory idea or philosophy."). An employer, for example, who verbally rejects a job applicant because of her gender is not immune from liability under Title VII.

In at least some circumstances, however, antidiscrimination statutes are in tension with the secondary effects doctrine. According to the Supreme Court, secondary effects that may legitimately be regulated by the State do not include "[l]isteners' reactions to speech ... [or] [t]he emotive impact of speech upon its audience." *R.A.V.*, 505 U.S. at 394–95, 112 S.Ct. at 2549 (quoting *Boos*, 485 U.S. at 321, 108 S.Ct. at 1163–64); yet the secondary effect that the government seeks to regulate through prohibiting discriminatory "conduct" frequently depend upon the anticipated response of the person discriminated against. If sexually derogatory remarks, to take Justice Scalia's example, did not have a damaging effect upon many women who hear them, there would be no need for such statements to be actionable under Title VII as discriminatory "conduct" creating a hostile work environment. Similarly, New Jersey need not prohibit employers from distributing advertisements or statements suggesting that employment opportunities are limited for persons possessing traits protected by the NJLAD if those statements were not likely to have the impact of discouraging protected persons from applying for jobs. *See* N.J.S.A. § 10:5–12c.

■ While recognizing these tensions inherent in characterizing antidiscrimination laws as regulation of conduct or secondary effects, this Court concludes that strict scrutiny is not required to assess the constitutionality of the challenged NJLAD provisions. *See Wisconsin v. Mitchell,* —— U.S. at ——, 113 S.Ct. at 2200 (1993); *R.A.V.,* 505 U.S. at 388–89, 112 S.Ct. at 2546. *See also Roberts v. Jaycees,* 468 U.S. 609, 628, 104 S.Ct. 3244, 3255, 82 L.Ed.2d 462 (1984); *Hishon v. King & Spalding,* 467 U.S. 69, 78, 104 S.Ct. 2229, 2235, 81 L.Ed.2d 59 (1984); *Runyon v. McCrary,* 427 U.S. 160, 176, 96 S.Ct. 2586, 2597, 49 L.Ed.2d 415 (1976) (upholding antidiscrimination statutes against challenges that they unconstitutionally suppressed the message conveyed by refusing to associate with women or African–Americans). Rather, an intermediate level of scrutiny applies.

■ In fact, the tests established by the Supreme Court in *Renton* for permissible regulation of secondary effects test and *O'Brien* for expressive conduct are substantially similar. *Compare Renton,* 475 U.S. at 47, 106 S.Ct. at 928–29, *with O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679. Content-neutral regulations of secondary effects withstand constitutional scrutiny "so long as they are designed to serve a substantial government interest and do not unreasonably limit alternative avenues of communication." *Renton,* 475 U.S. at 47, 106 S.Ct. at 928–29 (citations omitted). If a regulation places greater restrictions on First Amendment freedoms "than is essential to the furtherance of that [government] interest," in violation of *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679, then the regulation also "unreasonably limit[s] alternative avenues of communication." *Renton,* 475 U.S. at 47, 106 S.Ct. at 928 (citations omitted).

As this Court indicated in the discussion of *Pullman* abstention, section II.C.3, *supra,* New Jersey has described its interest in eliminating discrimination on the basis of race, creed, sexual orientation, and gender, among other characteristics, as being of "pre-eminent social significance." *Passaic Daily News,* 63 N.J. at 484, 308 A.2d 649 (citations omitted); see also N.J.S.A. § 10:5–3 (Legislature's statement of findings). New Jer-

sey's interest is not only substantial but also can be characterized as compelling. Section 10:5–12e, which generally prohibits aiding and abetting discrimination in violation of the NJLAD, thus furthers this substantial State interest. *See Renton,* 475 U.S. at 47, 106 S.Ct. at 928–29 (citations omitted).

■ New Jersey's "interest in prohibiting such discrimination in these situations [employment, public accommodations, and business transactions] is not directed at or related to suppressing expression." *Jewish Community Relations Council,* 968 F.2d at 295. As the Second Circuit noted in *Jewish Community Relations,*

[i]f discrimination engaged in by "primary" actors using words can be constitutionally outlawed, *see R.A.V.,* [505 U.S. at 390–91], 112 S.Ct. at 2547, so too can discrimination engaged in by third parties who use speech or other expressive conduct to coerce [or aid and abet] a "primary" actor to violate an antidiscrimination statute.

968 F.2d at 296. A statute regulating conduct or secondary effects is not unconstitutional simply because speech or expressive conduct may occasionally provide the vehicle for committing a violation. *Id.* at 295 (citing *R.A.V.,* 505 U.S. at 388–89, 112 S.Ct at 2546). Expressive conduct is "not shielded from regulation merely because [it] expresses a discriminatory idea or philosophy." *R.A.V.,* 505 U.S. at 390, 112 S.Ct. at 2547.

■ Furthermore, the NJLAD does not prohibit all speech or written materials containing discriminatory statements. Rather, the challenged aid and abet provisions incidentally restrict speech activities in extremely limited circumstances. As interpreted by Director Stewart, the only speech activities that the challenged aid and abet provisions apply to are printing and distribution of written materials. Moreover, printing and distribution are not incidentally restricted in all circumstances, but only where it they are likely to have discriminatory secondary effects of discrimination in employment, public accommodations, business or real estate transactions. *See* N.J.S.A. §§ 10:5–12c, f, g, h. Therefore, the challenged aid and abet provisions of the NJLAD, sections 10:5–12e and n, do not unreasonably limit Reverend

Cummings and other OPC members' ability to express and to disseminate their belief that homosexuality, bisexuality, and sex outside of marriage are wrong. *See Renton,* 475 U.S. at 47, 106 S.Ct. at 928–29 (citations omitted).

While this analysis disposes of Reverend Cummings' challenge to the general aid and abet provision, section 10:5–12e, this Court must address one final objection that relates solely to section 10:5–12n, which prohibits aiding and abetting in the specific context of business and credit transactions.

Section 10:5–12n, the aid and abet provision, and the NJLAD sections that prohibit primary discrimination in business and credit transactions, sections 10:5–12*l* and m, contain explicit exceptions. All three provisions exempt discriminatory refusals to do business and aiding and abetting such refusals "pertaining to employee-employer collective bargaining, labor disputes, or unfair labor practices, or made or taken in connection with a protest of unlawful discrimination or unlawful employment practices." N.J.S.A. § 10:5–12n(2); see also N.J.S.A. §§ 10:5–12*l*, m.

According to Reverend Cummings, section 10:5–12n, these exceptions to the general ban against discrimination in business and credit transactions are content-based and therefore violate the First Amendment. The statutory language itself does not fully support Reverend Cummings' claim of content-based discrimination. Sections 10:5–12n, *l* and m permit aiding and abetting discrimination in business transactions "pertaining to" or "made in connection with" a labor dispute. This language could just as easily apply to the context in which expressive conduct constituting aiding and abetting discrimination occurs, as to the message of that conduct.

Arguing that section 10:5–12n is unconstitutional, Reverend Cummings relies upon cases that invalidated ordinances prohibiting all picketing within a public forum except for pickets related to labor disputes. *Mosley,* 408 U.S. at 99, 92 S.Ct. at 2292; *Carey v. Brown,* 447 U.S. 455, 471, 100 S.Ct. 2286, 2295–96, 65 L.Ed.2d 263 (1980). *See also Rappa,* 18 F.3d at 1063 ("When the government creates content-based exemptions from a general ban, it implies that it does not have

as great an interest in limiting speech as the general ban suggests."); *Cincinnati v. Discovery Network,* —— U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). To survive constitutional challenge, a content-based restriction on speech in a public form must survive strict scrutiny. *E.g., Carey,* 447 U.S. at 465, 100 S.Ct. at 2292 (requiring a compelling state interest and no adequate content-neutral alternatives).

In contrast, the NJLAD does not target expression, but conduct or secondary effects. As a result, the NJLAD is subject a lower level of constitutional scrutiny than the picketing regulations at issue in *Mosley* and *Carey.* In regulating conduct and secondary effects legislatures frequently draw distinctions. In making such distinctions, legislatures must comply with the Equal Protection clause of the Fourteenth Amendment. Where a statute targets conduct or secondary effects, these distinctions need only be rationally drawn in order to withstand constitutional scrutiny. *See Renton,* 475 U.S. at 53, 106 S.Ct. at 932 (citing *Williamson v. Lee Optical of Oklahoma,* 348 U.S. 483, 488–89, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955) (rejecting claim that city ordinance regulating adult movie theaters was invalid because it did not target other adult businesses presumably generating the same secondary effects)). *See also Mitchell,* —— U.S. at ——, 113 S.Ct. at 2200 (" 'it is but *reasonable* that among crimes of different natures those should be most severely punished, which are the most destructive of the public safety and happiness.' " (quoting 4 W. Blackstone, *Commentaries* *16)).

Reverend Cummings's bases his equal protection challenge to section 10:5–12n upon the mistaken premise that the provision was subject to strict scrutiny and that any content-based exceptions were presumptively invalid. Throughout this litigation, Reverend Cummings has never called the legitimacy of the distinctions drawn by section 10:5–12n into question. Neither party addressed this issue in its briefs. As a result, a rational basis challenge to the provision prohibiting aiding and abetting discrimination in business transactions is not before the Court and cannot provide a basis for invalidation.

### 3. Summary of Conclusions

Reverend Cummings advocated two theories in support of his facial challenges to sections 10:5–12e and n: (1) overbreadth; and (2) content or viewpoint-based discrimination. This Court has concludes that both theories for facially invalidating the challenged NJLAD provisions lack merit. Therefore, Reverend Cummings' motion for summary judgment requesting this Court to declare each provision, sections 10:5–12e and n, facially unconstitutional is **denied.** Accordingly, the Defendants' motion to dismiss Reverend Cummings' claims of facial invalidity on their merits is **granted.**

### E. Reverend Cummings' "As Applied" Challenge

■ Having concluded that Reverend Cummings' facial challenges to the two statutory provisions lack merit, this Court must revisit the issue of *Pullman* abstention. *See City of Houston,* 482 U.S. at 467, 107 S.Ct. at 2512 (quoting *Dombrowski,* 380 U.S. at 489–90, 85 S.Ct. at 1122–23) (indicating that *Pullman* abstention is inappropriate where a plaintiff "justifiably" mounts a facial challenge to a statute).

As this Court indicated in its discussion of *Pullman* abstention, section II.C *supra,* all other relevant factors: the uncertainty of New Jersey law on the challenges aiding and abetting as applied to religiously or politically motivated speech; the ability of a state court decision to narrow the federal constitutional issues presented; and the important state interests that are at stake, this Court exercises its discretion to abstain from deciding the merits of Reverend Cummings claim that sections 10:5–12e and n are unconstitutional as applied to him and other OPC members. *See Hughes,* 906 F.2d at 964.

Defendants mistakenly contend that *Pullman* abstention results in dismissal of Reverend Cummings' claims. By abstaining under *Pullman,* a federal court does not abdicate jurisdiction but merely postpones its exercise. *Harrison,* 360 U.S. at 177, 79 S.Ct. at 1030 (1959) (citations omitted). As a result, this Court **retains** jurisdiction over Reverend Cummings' as applied challenge to sections 10:5–12e and n pending an adjudication by the New Jersey courts. Unless and until such an adjudication is made, this action shall be **administratively terminated.**

### III. CONCLUSION

Since the Defendants' failed to file an appropriate pleading, this Court must deny Defendants' request for a declaratory judgment stating that Director Stewart's original and supplemental affidavits represent New Jersey's official interpretation of the NJLAD, as amended in 1992 to protect persons from discrimination based upon affectational or sexual orientation.

With respect to Reverend Cummings, his motion for summary judgment is **denied.** Defendants' motion to dismiss is **granted in part and denied in part.** Reverend Cummings' challenges to sections 10:5–12c, f, *l* and m are **dismissed** as having been previously abandoned in this litigation. His challenge to the notice posting provision, section 10:5–12j is **dismissed,** without prejudice, as unripe for adjudication. In addition, his facial challenges to sections 10:5–12e and n are **dismissed** on the merits. Finally, this Court **shall abstain** from adjudicating the merits of Reverend Cummings' challenges to 10:5–12e and n as they apply to him and other OPC members but **retains jurisdiction** over these claims pending a state court adjudication.