NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0711-17T3

OASIS THERAPEUTIC LIFE
CENTERS, INC.,

    Plaintiff-Appellant,

v.

PETER G. WADE and SUSAN
WADE,

    Defendants-Respondents,

and

NAVESINK INVESTMENTS LLC;
ROBERT PHILLIPS and LOREN
PHILLIPS,

    Defendants.

_____

APPROVED FOR PUBLICATION

December 10, 2018

APPELLATE DIVISION

Argued October 2, 2018 – Decided December 10, 2018

Before Judges Fisher, Geiger and Firko.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-1287-17.

Steven H. Holinstat (Proskauer Rose, LLP) of the New York bar, admitted pro hac vice, argued the cause for appellant (Proskauer Rose, LLP, and Gasiorowski & Holobinko, attorneys; Steven H. Holinstat, Alychia L. Buchan, and Ronald S. Gasiorowski, on the brief).

Brian J. Chabarek argued the cause for respondents (Davison, Eastman, Munoz, Lederman & Paone, PA, attorneys; Brian J. Chabarek, of counsel and on the brief).

Leslie A. Koch argued the cause for amicus curiae New Jersey Defense Association (Methfessel & Werbel, attorneys; Leslie A. Koch, on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

Plaintiff's complaint alleged that defendants' interference with plaintiff's efforts to purchase property for use as a group home for autistic individuals violated the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. We conclude, as the LAD makes clear, that it is, in fact, unlawful to discriminate against a buyer because of the disability of a person intending to live on the premises, even if the buyer does not fit within the protected class, N.J.S.A. 10:5-4.1, and that it is, with a discriminatory intent, unlawful to interfere with another's transaction, N.J.S.A. 10:5-12(n). Plaintiff asserted actionable LAD claims and the motion judge erred in dismissing the complaint for failure to state a claim on which relief might be granted. R. 4:6-2(e). And we reject the judge's determination that defendants' alleged interference with plaintiff's attempt to secure a monetary grant from a nonprofit foundation to

assist with its purchase was protected by the <u>Noerr-Pennington</u> doctrine[1] because it was not shown the nonprofit foundation was a governmental or quasi-governmental body.

I

Joan Mai Cleary, a nurse and mother of an autistic child, possessed an interest in developing educational programs for the autistic.[2] In considering the difficult transition of autistic children from childhood into young adulthood, she and her husband, John Cleary, formed Ongoing Autistic Success in Society (Oasis), a nonprofit charitable organization, to create transitional residential adult independent learning (TRAIL) centers; these centers were intended as a transition program similar to the college experience and, for students who

---

[1] The <u>Noerr-Pennington</u> doctrine – named for <u>E. R.R. President's Conference v. Noerr Motor Freight, Inc.</u>, 365 U.S. 127, 136-38 (1961), and <u>United Mine Workers of Am. v. Pennington</u>, 381 U.S. 657, 669-70 (1965) – was crafted by the Supreme Court to immunize from suit the conduct of those who petition the government for redress or seek to influence governmental action.

[2] The motion judge was required to assume the truth of the complaint's allegations and provide plaintiff with the benefit of all reasonable inferences. <u>Printing Mart-Morristown v. Sharp Elecs. Corp.</u>, 116 N.J. 739, 746 (1989). He was required, as are we, to search the complaint "in depth and with liberality to determine whether a cause of action can be gleaned even from an obscure statement." <u>Seidenberg v. Summit Bank</u>, 348 N.J. Super. 243, 250 (App. Div. 2002). In adhering to this standard, the facts we discuss in this opinion are taken from the complaint and assumed to be true.

3

successfully complete that program, to establish permanent farm centers where attendees could live and work into the future. The Clearys believed the peaceful and natural setting of a farm would provide a rewarding and therapeutic working and living environment for challenged individuals.

In establishing its first TRAIL center, Oasis purchased a twenty-six-acre Monmouth County estate. Given the program's success, Oasis sought a second site as a permanent place to live and work for those who "graduated" after four or five years at the first TRAIL center.

In February 2015, Oasis offered to buy from its owner a large residential property on Navesink River Road in Middletown for the purpose of establishing a new Oasis farm. Oasis offered $2,200,000 contingent on a $600,000 grant from the Monmouth Conservation Foundation (MCF).[3] A few months later, MCF's acquisitions committee approved a resolution for the $600,000 grant subject to full board approval. Approval of the full MCF board, however, was delayed when one board member, who apparently lived near the property, expressed a concern about the Sandy Hook Elementary School shooting and a possible link between autism and that tragic event; as Oasis alleged in its

---

[3] Oasis partnered with MCF and others when it purchased the first TRAIL center.

complaint, this assertion was based on the misguided leap that "autistic individuals are inherently deranged murderers." This circumstance, according to Oasis, marked the beginning of the harassing and discriminatory conduct that followed.

Undeterred by this "unfounded fear," Oasis and the property owner contracted in April 2015; their agreement was contingent on the anticipated MCF grant. Before the next scheduled MCF vote, however, defendants Peter and Susan Wade (defendants) and others in the neighborhood began a door-to-door campaign, compiling signatures on a petition objecting to the anticipated MCF grant. Oasis claims this campaign provoked the MCF into denying the grant.

Defendants and other neighbors also cobbled together a sham offer to induce the property owner to back out of his commitment to sell to Oasis. Upon learning this, Oasis offered to drop the MCF contingency in its contract, but Oasis claims the neighborhood pressure was enough to cause the owner to terminate his relationship with Oasis. But defendants dragged out the contractual process and, on the eve of closing – having heard Oasis decided to look for property elsewhere – defendants and their comrades walked away from

5

the deal. In May or June 2015, the property owner again approached Oasis, and the deal – this time without the MCF contingency – was resurrected.

Anonymous individuals – who did not identify themselves – wrote to the property owner, reminding him that "[w]e have all been good neighbors" and "up until now you have been a good neighbor." "Why," they rhetorically asked, "would you do this to us?" And: "[h]ow can you live with yourself?" They claimed that what the property owner was "doing to us" was "hurtful" and the cause of "much anxiety."

These unidentified neighbors asserted that they were "still prepared to purchase the property" and "quickly." They urged the property owner to "PLEASE. PLEASE. PLEASE give us this opportunity." Within a few days of this anonymous letter, defendant Peter G. Wade (Wade) telephoned Mai Cleary, expressing regret about "the grievous error of withdrawing [his] offer" to purchase the property. He offered to make a $250,000 contribution to Oasis in exchange for an assignment of Oasis's contract rights; Oasis rejected this "donation/bribe." Oasis also alleged that Wade offered to pay the seller $250,000 to break his contract with Oasis. That offer was also rebuffed, and Oasis's transaction closed on July 2, 2015.

The closing, according to the complaint, did not deter defendants' discriminatory conduct. In fact, days before the closing, Wade asked that Oasis discontinue its use of a shared driveway; Oasis declined but, "as a courtesy," said it would limit its use. Wade responded that he believed the prior owner had "already abandoned the easement" and that he would "proceed[] legally to have it [so] declared."

According to the complaint, defendants' actions devolved from churlish to destructive. In November 2015, Oasis residents woke to find and be alarmed by what is described in the complaint as "enormous, garish and frightening graffiti" that included depictions of snakes and fire covering "approximately 600-700 square feet on and at the [Oasis] driveway." Wade admitted "we did that."

The following month, defendants allowed to trespass onto Oasis's property their "very aggressive goat," which "head butt[ed]" Mai Cleary. They also allowed a horse to graze on Oasis's property, leaving piles of manure. Indeed, the complaint alleged defendants dumped "literally hundreds of pounds" of horse manure on Oasis's property.

That same month, defendants constructed a fence across the easement. When Oasis objected, defendants agreed to but never did remove the fence. Oasis also alleged that in April 2016, a neighborhood attorney attempted to

convince the tax assessor that Oasis should be paying property taxes, falsely claiming autistic children did not live on the property.

## II

In May 2016, the Wades commenced a quiet title action in the Chancery Division. Oasis answered the complaint and filed a counterclaim against the Wades. Oasis also filed a third-party complaint against others, in which Oasis alleges, among other things, interference with their easement and property rights and violations of the LAD.[4]

The Chancery judge severed Oasis's LAD claims and directed their refiling in the Law Division.[5] Oasis complied and filed in the Law Division a complaint against the Wades, Navesink Investment Co., Robert Phillips, and Loren Phillips. Oasis alleged the facts summarized in the first section of this opinion and demanded injunctive relief, as well as compensatory and punitive damages.

---

[4] Oasis alleged that, in February 2017, Wade or someone acting on his behalf dug up a large cement survey marker that served to delineate a boundary between the Oasis and Wade properties.

[5] The appellate record offers no insight into the status of the chancery portion of the parties' disputes. The parties agree its status or disposition has no bearing on the issues before us.

A-0711-17T3

Defendants quickly moved pursuant to <u>Rule</u> 4:6-2(e) to dismiss for failure to state a claim upon which relief might be granted, and Oasis cross-moved pursuant to <u>Rule</u> 4:9-1 for leave to file an amended complaint that would add claims of tortious interference with both contractual relations and prospective economic advantages (the tortious interference claims) and trespass. The amended complaint also sought to add three additional defendants: MCF board member Dan Crabbe, his wife Nancy Crabbe, who had expressed fear of another Sandy Hook massacre if Oasis joined the neighborhood, and Richard McOmber, Esq., who urged the tax assessor to pursue Oasis on a false claim that no autistic individuals were living on the property.

The motion judge granted defendants' motion. He also permitted the filing of an amended complaint but only as to the new trespass claim; the tortious interference claims were precluded. So limited, Oasis chose not to file the amended complaint and filed this appeal instead.

III

In appealing the dismissal order, Oasis contends the motion judge erred: (a) by finding Oasis lacked standing to assert LAD claims; (b) by determining Oasis failed to plead a cognizable LAD claim; (c) by applying the <u>Noerr-Pennington</u> doctrine and First Amendment in immunizing defendants' conduct;

9

and (d) by barring Oasis's proposed tortious interference claims. We largely agree with Oasis's arguments and reverse.

A

The question of standing need not long detain us.

We initially consider and quickly reject any notion that because Oasis is a corporation or business entity – and not an individual – it is not a "person" within the meaning of the LAD. The motion judge didn't draw such a conclusion, but the point is discussed in the parties' submissions, so we briefly observe that for LAD purposes, a "person" may be more than just an individual. See N.J.S.A. 10:5-5(a) (absent "a different meaning clearly appear[ing] from the context," a "'person' includes one or more individuals, partnerships, associations, organizations, labor organizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and fiduciaries").

We also consider the more nuanced question of Oasis's entitlement to assert claims of discrimination on its own behalf or on behalf of those who benefit from its charitable works. We conclude there is no doubt that Oasis has standing to assert these claims in its own right. N.J.S.A. 10:5-13 declares that a claim may be pursued by "[a]ny person claiming to be aggrieved by an unlawful employment practice or an unlawful discrimination . . . ." Accepting

A-0711-17T3

as we must the allegations of the complaint, Oasis claims it has been damaged directly by – among other things – defendants' alleged attempts to interfere with Oasis's efforts to purchase the property, through the vandalizing of its property, in the efforts to interfere with its easement rights, and its loss of the MCF grant. This claim of economic damage allegedly resulting from defendants' alleged discriminatory conduct sufficiently meets the standing required by the LAD.

Beyond this alleged direct economic damage, we agree with the sentiments expressed in Kessler Inst. for Rehab. v. Essex Fells, 876 F. Supp. 641, 652 (D.N.J. 1995), that a party in Oasis's position may also incur "stigmatic and associational" damage in this way; viewing Oasis's allegations broadly, as we must, see n. 2, defendants' conduct may be viewed as interfering with Oasis's relationship to those who benefit from its existence and its good works. N.J.S.A. 10:5-13 authorizes the pursuit of a claim generated by the unlawful discrimination of others even when that discrimination was more directly geared toward or engaged against those with whom the plaintiff has a relationship. Thus, Oasis is entitled to seek relief based on the conduct directed toward it because of the benefits it provides to others in a protected class. That too is sufficient to confer standing on Oasis under the LAD.

11

B

We are also satisfied that Oasis has presented a viable LAD claim.[6]

The LAD's "overarching goal . . . is nothing less than the eradication 'of the cancer of discrimination.'" L.W. v. Toms River Reg'l Schs. Bd. of Educ., 189 N.J. 381, 399 (2007) (quoting Jackson v. Concord Co., 54 N.J. 113, 124 (1969)). "Freedom" from this cancer "is one of the fundamental principles of our society," Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 600 (1993) – a principle of such importance that we have been directed to liberally construe the LAD's provisions, L.W., 189 N.J. at 400; accord N.J.S.A. 10:5-3 (declaring "this act shall be liberally construed in combination with other protections available under the laws of this State"), in pursuit of the LAD's goals.

With this in mind, we readily conclude that Oasis pleaded a maintainable LAD cause of action against these defendants as well as those Oasis sought to

---

[6] Oasis has argued that its claims fall within numerous LAD provisions. Because the action was dismissed for failure to state a claim, it is enough that we find at least one maintainable LAD cause of action in order to reverse and remand this action. So, we need not determine whether all Oasis's pleaded claims are viable. We leave the question of whether Oasis has pleaded or maintained any other LAD claims to be developed through discovery and other proceedings in the trial court.

A-0711-17T3

join as defendants. N.J.S.A. 10:5-4.1 makes it unlawful "to discriminate against any buyer or renter because of the disability of a person residing in or intending to reside in a dwelling after it is sold, rented or made available or because of any person associated with the buyer or renter." That provision clearly does not mean that a seller or landlord must possess the discriminatory intent or that a buyer or renter is the person directly discriminated against. This provision's plain meaning supports what is alleged to have occurred here – that defendants targeted and tormented Oasis because Oasis was providing a residence for autistic individuals. N.J.S.A. 10:5-4.1 renders that conduct unlawful, and the judge erred in dismissing the action for this reason alone.

N.J.S.A. 10:5-12(l) also makes it unlawful for a person to refuse to transact with another because of a protected characteristic.[7] Applied here, this provision would render, for example, the former property owner from fulfilling its contractual obligation to Oasis for a discriminatory reason. No one argues or suggests the prior owner could or should be so accused. But, in arguing such

---

[7] This section prohibits "any person" from "refus[ing] to buy from, sell to, lease from or to, license, contract with, or trade with, provide goods, services or information to, or otherwise do business with any other person on the basis of . . . disability . . . of such other person or such other person's spouse, partners, members, stockholders, directors, officers, managers, superintendents, agents, employees, business associates, suppliers, or customers."

a limitation in these provisions, defendants fail to recognize that the LAD also renders unlawful the conduct of those who, with discriminatory animus, would attempt to induce such a result. That is, while the prior owner here did not engage in discriminatory conduct, defendants are alleged to have acted or conspired to incite the owner to breach his contract with Oasis. Such conduct is forbidden by N.J.S.A. 10:5-12(n), which makes it unlawful "[f]or any person to aid, abet, incite, compel, coerce, or induce the doing of any act forbidden by [N.J.S.A. 10:5-12(l)] . . . or to attempt, or to conspire to do so." So, while the prior owner's actions were not spurred on by any discriminatory actions on <u>his</u> part as prohibited by N.J.S.A. 10:5-12(l), defendants' actions were alleged to have induced or attempted to induce a discriminatory result by interfering with the prior owner's dealings with Oasis. The LAD prohibits this[8] and provides a cause of action to redress defendants' alleged conduct.[9]

---

[8] To provide a simpler but apropos example, if a Caucasian (A) agreed to sell or negotiated to sell his property to an African-American (B) but A's Caucasian neighbors (C, D, and E) acted with a discriminatory intent to cause or attempt to cause A to breach his contract with or decline to sell to B, there is no doubt B would have an actionable claim against C, D and E under these provisions. This is essentially what is alleged to have occurred here; Oasis is just in a different protected class.

[9] Defendants argue that N.J.S.A. 10:5-12(n) does not apply in this setting because the specific types of prohibited conduct identified in its subsections (1)

14

C

Defendants argue, and the motion judge held, that defendants' efforts to thwart Oasis's attempts to secure a $600,000 MCF grant were immunized by the Noerr-Pennington doctrine.[10]

The Noerr-Pennington doctrine, see n. 1, recognizes "the fundamental values that undergird a citizen's right to communicate on issues of public

and (2) suggest a commercial setting rather than a dispute among neighbors. We disagree. In describing the conduct prohibited by the aiding and abetting provisions of N.J.S.A. 10:5-12(n), the Legislature clearly stated that the conduct prohibited "shall include, but not be limited to" those two examples. The first prohibits "[b]uying from, selling to, leasing from or to, licensing, contracting with, trading with, providing goods, services, or information to, or otherwise doing business with any person because that person does, or agrees or attempts to do, any such act or any act prohibited by this subsection." N.J.S.A. 10:5-12(n)(1). And the second bars "[b]oycotting, commercially blacklisting or refusing to buy from, sell to, lease from or to, license, contract with, provide goods, services or information to, or otherwise do business with any person because that person has not done or refuses to do any such act or any act prohibited by this subsection . . . ." N.J.S.A. 10:5-12(n)(2). In so crafting N.J.S.A. 10:5-12(n), the Legislature may have thought that the general language in subsection (n) might not be understood to encompass certain specific commercial conduct and intended to make clear its reach through the inclusion of subsections (1) and (2). But its included-but-not-limited-to language bespeaks an intent to provide other prohibitions, not just commercial prohibitions, such as the historically common discriminatory conduct mentioned in n. 7.

[10] It is important to recognize that the Noerr-Pennington doctrine, if applicable, would bar Oasis's claims only insofar as those claims are based on the loss of the grant, not otherwise.

A-0711-17T3

import," Fraser v. Bovino, 317 N.J. Super. 23, 37 (App. Div. 1998), by immunizing such actors from suit. Courts recognize an exception to immunity when the conduct "is a mere sham to cover," for example, "'an attempt to interfere directly with the business relationships of a competitor.'" Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 51 (1993) (quoting Noerr, 365 U.S. at 144). In considering whether conduct is a "mere sham," the conduct must be examined objectively and "without consideration of the actor's underlying motivation, no matter how improper it may be." Fraser, 317 N.J. Super. at 38. That is, the legality of an objectively reasonable petition directed toward obtaining governmental action is "not at all affected" if the actor's motivation was anticompetitive. In short, that "a private party's . . . motives are selfish is irrelevant." City of Columbia v. Omni Outdoor Advert., Inc., 499 U.S. 365, 380 (1991). The presumption of immunity, however, is lost when the suit or an application to a governmental body is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and when the intent is to further wrongful conduct "through the 'use [of] the governmental process – as opposed to the outcome of that process.'" Prof'l Real Estate Inv'rs, 508 U.S. at 60-61. See Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 500 n.4 (1988) (holding that "private action that is not

genuinely aimed at procuring favorable government action is a mere sham that cannot be deemed a valid effort to influence government action"). Indeed, it has been recognized – but we need not presently decide – that so long as the private action is objectively reasonable it doesn't matter if the actor had racial or discriminatory motives. See Barnes Found. v. Twp. of Lower Merion, 927 F. Supp. 874, 876-77 (E.D.Pa. 1996).

The error in the application of the Noerr-Pennington doctrine here is that it has not been shown that defendants – in seeking to interfere with or kill the $600,000 MCF grant – were petitioning the government. Instead, defendants acknowledge that MCF "is a nonprofit organization rather than a governmental entity" (emphasis added). At defendants' urging, the motion judge concluded that MCF must be a quasi-governmental entity because it was exercising abilities "similar to that of a governmental entity regulating land use." But there is no evidence to support this. The record reveals only that MCF is a nonprofit charitable entity organized under 26 U.S.C. § 501(c)(3); what governmental body is organized under that Act of Congress? And any claim that MCF was acting as a quasi-governmental agency could not be resolved on this record or

17

at this stage,[11] when the judge was required to provide Oasis with all reasonable inferences.[12]

We similarly reject defendants' argument that the First Amendment insulates them from Oasis's claims. Defendants were not free to violate the LAD simply because the means used to discriminate included speech. Presbytery of the Orthodox Presbyterian Church v. Florio, 902 F. Supp. 492, 521 (D.N.J. 1995). We agree with Oasis that "[w]hile [d]efendants are free to get up on their proverbial soapbox and make public their negative views about people afflicted

---

[11] According to its website, which is referred to in the appellate record, MCF is a 501(c)(3) nonprofit entity that was organized for the purpose of "preserving land and protecting the natural habitat" acting as a "facilitator and/or [sic] partner among public and private entities" and aiming to "preserve land by determining how a property will be best preserved and utilized so the public-at-large benefits." Monmouth Conservation Foundation, www.monmouthconservation.org/menu/ (last visited Dec. 3, 2018). MCF provides services to help "residents, landowners, and municipalities preserve the lands that are important to their communities," such as funding, easement monitoring, and negotiating land transaction for municipalities. Monmouth Conservation Foundation, www.monmouthconservation.org/our-services/ (last visited Dec. 3, 2018). Defendants have not shown how such activities ought to allow a court to view MCF as a quasi-governmental entity.

[12] The parties have not briefed and we, consequently, do not consider whether prospective defendant McOmber's alleged conduct in seeking to invoke the taxing authority of a governmental body fits within the Noerr-Pennington doctrine's parameters. Indeed, Oasis has not yet been given the opportunity of pursuing any claims against McOmber. Our consideration of that issue would, therefore, be premature.

with autism, such expression loses its First Amendment protection when it is used as [a] vehicle for discriminatory conduct that violates the LAD and the State's interest in eliminating discrimination."

D

Lastly, we consider the judge's denial of Oasis's motion to amend its complaint to include tortious interference claims. The facts we have already discussed sufficiently support these claims, and it requires no further burdening of this record or extensive citation to cases to demonstrate that. In fact, we view defendants' response to this part of the appeal as chiefly relying on the <u>Noerr-Pennington</u> and First Amendment arguments we have already rejected. It suffices to observe that Oasis alleged that defendants wrongfully interfered in its contract with the former owner or with the economic opportunity its negotiations presented, and sought to undermine those rights by successfully interdicting the $600,000 grant. The elements of both tortious interference claims were contained in the proposed amended complaint that the judge would not permit be filed. <u>See generally</u> <u>LaMorte Burns & Co. v. Walters</u>, 167 N.J. 285, 305-06 (2001). Absent some other reason for withholding leave to file an amended complaint unsuggested by the record, the judge was obligated to grant the relief Oasis sought.

In a convoluted argument, defendants contend the judge – despite his clear statements on the record and the content of the memorializing order – actually permitted Oasis to file an amended complaint that would include its tortious interference claims. We find this argument lacking in sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E). There is no doubt that the judge denied Oasis the opportunity to file an amended complaint including these tortious interference claims[13] and erred in doing so.

Defendants are correct, however, that the judge permitted Oasis to file an amended complaint that would include a trespass claim. Oasis chose not to do so and instead made the conscious decision to allow the consequence of its inaction to evolve into a final and appealable order. Oasis did not have the right to momentarily forego its new trespass claim in order to obtain appellate review of the other issues while retaining for itself the right, upon succeeding on appeal, to reinvigorate the abandoned claim. We agree with defendants that the trespass claim Oasis would have presented in the amended complaint was waived because, in this indirect way, Oasis clearly and unequivocally relinquished its

---

[13] The judge actually provided no explanation for barring the tortious interference claims. We assume the judge mistakenly believed those claims were foreclosed as a result of the other rulings we have found to be erroneous. But he certainly did not mean to allow them to be included in the amended complaint permitted.

right to pursue it.  See Scibek v. Longette, 339 N.J. Super. 72, 82 (App. Div. 2001).  But, to the extent the original complaint contained the fundament of such an action, it may continue to be pursued because the waiver concept we apply can have no application to those claims asserted in the original complaint.[14]

* * *

To summarize, we reverse the order that dismissed the complaint and that denied Oasis leave to file an amended complaint that would include its tortious interference claims.  Under the circumstances, the trespass claim that Oasis would have added by way of the proposed amended complaint but consciously chose not to file is barred by the doctrine of waiver.

Reversed and remanded for entry of an order permitting the filing of an amended complaint in conformity with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[14]  We do not think that Oasis was faced with a Hobson's choice such that might have caused us to view this waiver issue differently.  Oasis was merely in the position of either taking the action it took or filing the trespass amended complaint and moving for leave to appeal.  Considering how the motion judge deeply eviscerated Oasis's complaint, it is highly likely we would have granted leave to appeal.  If, however, Oasis took that action, and we somehow declined to grant such an application, Oasis could then have dismissed its trespass claim in order to achieve finality and then the waiver issue might have been put on a different footing.

A-0711-17T3